# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DR. MANHUA MANDY LIN,

          Plaintiff,

          v.                                     2:11-cv-3158-WY

ROHM AND HASS COMPANY d/b/a
DOW ADVANCED MATERIALS,

          Defendant.

## MEMORANDUM

YOHN, J.                                                April 14, 2014

      Dr. Manhua Mandy Lin brings this action against Rohm and Haas Company d/b/a Dow Advanced Materials ("RH"), alleging retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* and the Pennsylvania Human Relations Act (the "PHRA"), 43 Pa. Stat. Ann. §§ 952 *et seq.*, as well as breach of contract and intentional interference with prospective contractual relations. This is the latest in a series of lawsuits between the parties; Lin's claims in this action stem from RH's conduct in a lawsuit brought by the company in state court on June 2, 2000 and not yet resolved, as well as approaches RH allegedly made to the U.S. Department of Energy ("DOE").

      Currently before me is RH's motion for summary judgment. For the following reasons, I will grant RH's motion for summary judgment as to Lin's claims for breach of contract and

intentional interference with prospective contractual relations. But I will deny the motion with respect to Lin's claims under Title VII and the PHRA.

I.       **Factual Background and Procedural History**

      **A.       The Montgomery County Litigation**

Lin is a research scientist who was employed by RH from 1989 to 1999. On June 2, 2000, RH initiated a trade secrets lawsuit against Lin in the Montgomery County Court of Common Pleas ("Montgomery County Litigation"). In its complaint, RH alleged that Lin stole and published RH trade secrets related to acrylic acid, a chemical compound with which Lin had worked at RH.

RH's filing in the Court of Common Pleas followed several years of adversity between the parties. In January 1999, Lin filed an EEOC complaint in which she alleged that she had been discriminated against, retaliated against, and/or harassed in connection with her employment at RH. In November 1999, the EEOC-mediated a settlement between the parties providing, among other things, that Lin would leave the company and RH would be able to conduct a trade secrets review prior to the publishing of any research by Lin. Prior to making a public presentation about acrylic acid in March of 2000, Lin sent her proposed presentation to RH for review. RH notified Lin that it had determined that a portion of her presentation revealed RH trade secrets; RH then threatened legal action to enforce those alleged trade secrets. Lin delivered the presentation nevertheless. On April 2, 2000, Lin filed a second complaint with the EEOC in which she claimed that RH's conduct relating to the presentation violated the EEOC-mediated settlement and constituted illegal harassment, retaliation, and intimidation. On May 23, 2000—ten days before RH initiated the Montgomery County Litigation—the EEOC notified RH about Lin's second complaint.

**B.      RH Requests and/or Motions Regarding Methacrylic Acid**

Although RH initiated the Montgomery County Litigation to prosecute trade secrets claims related to acrylic acid, RH also used the discovery process in the Montgomery County Litigation to seek information on Lin's work with a different compound—methacrylic acid—at EverNu Technology, LLC ("EverNu"). EverNu is a startup research company that Lin founded following her departure from RH. As of 2003, EverNu was conducting DOE-funded research on the production of methacrylic acid using isobutene and metal oxide catalysts.

In 2003, RH moved to compel Lin to produce documents and answer interrogatories related to EverNu's grant proposal to the DOE; it also subpoenaed EverNu's corporate designee to produce all of EverNu documents that (a) related to its incorporation and operation, (b) related to its business activities including government grants applied for and/or received, (c) contained technical information supplied by Lin, and (d) involved communications outside the company regarding technical information. In 2004, RH demanded Lin produce any information about methacrylic acid that she had submitted to the DOE. Lin and EverNu did not produce any of the requested information, either at that time or at any time thereafter.

In July 2004, RH successfully moved for court orders to enforce the methacrylic acid-related discovery requests. RH then made multiple successful motions for the Court of Common Pleas to sanction Lin and/or EverNu for noncompliance with the methacrylic acid-related discovery requests and/or the court orders that enforced them. The information was still not produced.

In September 2005, RH filed a motion for partial summary judgment in which it asked the Court of Common Pleas to (a) find that EverNu's methacrylic acid processes were RH property, (b) order Lin to assign all its intellectual property rights under the DOE grant to RH,

and (c) permanently enjoin Lin and/or any associated entities or individuals from researching methacrylic acid. After the Court of Common Pleas denied this motion in February 2006, RH pursued additional sanctions as well as recovery of amounts under previous sanctions.

In December 2007, RH moved for default judgment against Lin, and the Court of Common Pleas granted RH's motion for default judgment on May 2, 2008. As RH requested in its motion, the Court of Common Pleas permanently enjoined Lin and/or affiliated entities from using, disclosing, or divulging any information that RH considers confidential or a trade secret. Further, as RH had previously requested in its motion for partial summary judgment, the Court of Common Pleas permanently enjoined Lin from proceeding with research into methacrylic acid and/or engaging in activities related to methacrylic acid. The court further enjoined Lin from contributing to any publication or research grant proposal without ex ante RH trade secrets review.

On May 13, 2008, eleven days after the default judgment in the Montgomery County Litigation, RH wrote a letter to the DOE in which it highlighted the default judgment order, asked the DOE to sanction Lin and EverNu, and asked the DOE to disclose its plans regarding the information generated by EverNu's DOE-funded methacrylic acid project. In the letter, RH stated that the "work done by Dr. Lin and EverNu is based on the use of [RH's] trade secrets." The letter to the DOE was followed by a sequence of emails to the DOE from RH's in-house litigation chief, James Vouros, on June 3, June 23, July 1, July 17, July 18, and August 11, 2008. In these emails Vouros repeatedly asked the DOE about the status of its funding of the EverNu methacrylic acid project; at one point, Vouros stated that RH contemplated any additional steps necessary "to mitigate the continuing damage that RH is suffering."

4

On March 1, 2010, the Pennsylvania Superior Court decided Lin's appeal of the permanent injunction, vacating only those portions of the permanent injunction relating specifically to methacrylic acid. The Superior Court found the injunction as to methacrylic acid research and activities was issued "without sufficient indication in the record at hand that Lin's methacrylic acid research implicates [RH]'s confidential information or trade secrets almost ten years after the termination of Lin's employment." *See Lin v. Rohm & Haas*, 992 A.2d 132 (Pa. Super. 2010). On remand to the Court of Common Pleas, RH asked for and was granted a continuance. Today, four years later, the state court matter remains in abeyance.[1]

Lin and EverNu have never produced discovery related to methacrylic acid, and the Montgomery County Court has never issued a finding on the merits as to whether EverNu's methacrylic acid work implicates RH trade secrets.[2]

## C.    Lin's Federal Suits

In June of 2002, Lin filed a federal lawsuit in this judicial district under the anti-retaliation provisions of Title VII and PHRA based on RH's initiation and pursuit of the Montgomery County Litigation ("*Lin I*"). *See* E.D. Pa. Civ. No. 02-3612, Doc. 1. In *Lin I*, Lin alleged that her March 2000 acrylic acid presentation "was not in violation of any legal or contractual obligation to RH;" that RH "pursued the [Montgomery County Litigation] in bad faith and with full knowledge that the representations made to the court on its behalf were false, misleading and/or fabricated;" and that this conduct "was a continuation of the discrimination

---

[1] Lin asserts in her brief that the matter cannot be listed for trial unless the plaintiff there, RH, requests it. This is incorrect. Montgomery County Rule of Civil Procedure 212 provides a procedure by which either party can request a conference with a judge in order to have the case listed for trial.

[2] Although it is not necessary to the disposition of this motion, I note for the record that, as of early 2007, some specific information about EverNu's methacrylic acid work was available to RH and the Court of Common Pleas. Pursuant to a December 4, 2006 order of the Court of Common Pleas, Temple University—an EverNu research partner—produced 750 pages of research documents related to EverNu's methacrylic acid project and made Lin's collaborator Prof. Daniel Strongin available for deposition. Temple's production included EverNu's initial grant proposal to the DOE.

and retaliation . . . that had characterized RH's conduct during Lin's employment as well as retaliation against Lin for asserting her rights before the EEOC and PHRC and seeking the benefit of the EEOC/PHRC's enforcement proceedings."

In November 2003, the Honorable J. Curtis Joyner denied RH's motion for summary judgment on Lin's anti-retaliation claims, finding there were genuine issues of material fact as to whether retaliatory animus motivated RH's initiation of the Montgomery County Litigation. *See Lin I*, 293 F. Supp. 2d 505 (E.D. Pa. 2003). In January 2004, however, Judge Joyner granted judgment to RH on Lin's Title VII and PHRA claims on the basis that the Montgomery County Litigation was not sufficiently related to Lin's employment to constitute an adverse action under Title VII's anti-retaliation provision.[3] *See Lin I*, 301 F. Supp. 2d 403 (E.D. Pa. 2004).

On June 24, 2004, Lin filed an EEOC charge in which she alleged that RH's pursuit of methacrylic acid-related discovery in the Montgomery County Litigation was retaliatory. On February 1, 2011, the EEOC issued Lin a "for-cause" determination, and, on March 8, 2011, a notice of right to sue over her June 24, 2004 charge.

On May 13, 2011, Lin filed the instant lawsuit in which she brought claims for (1) violation of Title VII's anti-retaliation provision; (2) violation of the PHRA's anti-retaliation provision; (3) breach of the November 1999 EEOC-mediated agreement between the parties; and (4) intentional interference with prospective contractual relations.

---

[3] Judge Joyner's holding relied on *Farrell v. Planters Lifesavers Co.*, in which the Third Circuit stated that a prima facie case of retaliation under Title VII requires "an adverse employment action." *See* 206 F.3d 271, 279 (3d Cir. 2000). The Supreme Court has since clarified the scope of the adversity provision. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006) ("*Burlington Northern*"). After *Burlington Northern*, "a plaintiff claiming retaliation under Title VII must now show only that a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Weiler v. R&T Mech., Inc.*, 255 F. App'x 665, 668 (3d Cir. 2007) (quoting *Burlington Northern*, 548 U.S. at 68).

On March 26, 2012, in response to RH's motion to dismiss, I found that insofar as Lin's anti-retaliation claims were based on RH's August 2003 discovery requests and/or prior events, those claims were litigated in *Lin I* and thus barred by *res judicata*. But I permitted Lin's claims to continue insofar as they were based on events subsequent to August 2003. On May 22, 2012, I dismissed Lin's breach of contract claim but only insofar as it was based on an alleged failure of RH to reimburse Lin for time and expenses incurred in connection with post-employment services she provided to RH.

RH now moves for summary judgment on all claims.

## II.     Legal Standards

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (internal quotation omitted). "In evaluating the motion, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Guidotti v. Legal Helpers Debt Resolution, LLC,* 716 F.3d 764, 772 (3d Cir. 2013) (internal quotation omitted).

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted); *El v. Se. Pennsylvania Transp. Auth. (SEPTA)*, 479 F.3d 232, 237 (3d Cir. 2007). The burden then shifts to the

nonmoving party "to make a showing sufficient to establish the existence of . . . element[s] essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "If a nonmoving party fails to make [that showing], there is no issue as to a genuine issue of a material fact and thus the moving party is entitled to judgment as a matter of law." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 266 (3d Cir. 2007).

## III.   Discussion

According to RH: (1) the Petition Clause of the First Amendment immunizes its actions in the Montgomery County Litigation and/or its communications with the DOE so long as they had objectively reasonable bases; (2) the Pennsylvania judicial privilege doctrine immunizes it from liability for its conduct in the Montgomery County Litigation; (3) Lin cannot make a prima facie case or carry her final burden in pursuing her anti-retaliation claims under Title VII and the PHRA; (4) Lin's breach of contract claim is time-barred; and (5) Lin lacks standing to pursue her intentional interference claim.[4]

I will address these arguments as they apply to each of Lin's claims.

### A.   Title VII and PHRA Anti-Retaliation Claims

RH contends Lin cannot show a violation of Title VII or the PHRA's anti-retaliation provisions based on the Montgomery County Litigation or the DOE communications, but that, in any event, the Petition Clause of the First Amendment and Pennsylvania's common law litigation privilege immunize RH from liability. Lin responds there are genuine issues of material fact as to her Title VII and PHRA claims and that RH's defenses are inapposite.

### 1.   Cause of Action

---

[4] RH also raises First Amendment and judicial privilege defenses to Lin's breach of contract and intentional interference claims. Because I will grant judgment for RH on those claims in any event, I evaluate RH's First Amendment and judicial privilege defenses only as applied to Lin's Title VII and PHRA claims.

To succeed on a claim under Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a), a plaintiff must establish (1) she opposed a Title VII-violating employment practice or participated in a Title VII proceeding, and (2) because of this, her employer took adverse action against her. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013); *Verma v. Univ. of Pennsylvania*, 533 F. App'x 115, 119 (3d Cir. 2013). The U.S. Supreme Court has recently clarified that the employer's retaliatory act need not relate to employment and that claims must be proved according to traditional principles of but-for causation. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) ("*Burlington Northern*"); *Nassar*, 133 S. Ct. at 2534. Claims under the PHRA are interpreted coextensively with Title VII claims. *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006).

Under the *McDonnell Douglas* burden shifting framework, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a plaintiff first makes a prima facie Title VII retaliation case when she shows: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006). If the plaintiff establishes the prima facie case, the burden of production shifts to the employer to "advance a legitimate, non-retaliatory reason" for its adverse action. *Id.* at 341. If the employer discharges its burden, in order to prevail the plaintiff must show that "retaliatory animus played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process." *Shellenberger v. Summit Bancorp, Inc.,* 318 F.3d 183, 188 (3d Cir. 2003); *see also Nassar*, 133 S. Ct. at 2534 (holding Title VII retaliation requires but-for causation); *Krouse v. Am. Sterilizer Co.,* 126 F.3d 494, 500-01 (3d Cir. 1997) (employer's non-retaliatory explanation must be "false" or "pretextual").

####     a.     Prima Facie Case

####         i.     Adverse Action

RH contends Lin fails to make her prima facie case because she cannot show an adverse action within the meaning of Title VII. According to RH, its motions and discovery requests in the Montgomery County Litigation are inactionable because they complied with Pennsylvania's civil procedure rules, and its communications with the Department of Energy regarding Lin and EverNu are not actionable because they did not produce injury or harm to Lin.

To meet the adversity prong of the prima facie case, "a plaintiff must show [the challenged action] . . . might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 68. The Supreme Court has clarified that "the scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." *Burlington Northern*, 548 U.S. at 67. Moreover, it has counseled that there are "many forms that effective retaliation can take," and that "interpreting the anti-retaliation provision to provide broad protection from retaliation helps ensure the cooperation upon which accomplishment of the Act's primary objective depends." *Id.* at 64, 67. The Montgomery County Litigation requests at issue in this case—which relate to the production of the plaintiff's closely-held business information to her competitor, the imposition of monetary sanctions on the plaintiff, and the enjoinment of the plaintiff's research—are sufficient to establish a prima facie case that they "might well have dissuaded a reasonable [scientist-employee] from making or supporting a charge of discrimination." *See Burlington Northern*, 548 U.S. at 68; *see also Steffes v. Stepan Co*., 144 F.3d 1070, 1075 (7th Cir. 1998)

("Retaliatory acts come in infinite variety, and even actions taken in the course of litigation could constitute retaliation in appropriate circumstances.").[5]

As to RH's communications with the DOE, RH relies on *Burlington Northern*'s statement that "the anti-retaliation provision protects an individual . . . from retaliation that produces an injury or harm." *See Burlington Northern*, 548 U.S. at 67. The Third Circuit has interpreted *Burlington Northern* to mean that "where unlawful retaliation is claimed, the plaintiff need only show that an action . . . 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Moore*, 461 F.3d at 348 (quoting *Burlington Northern*, 548 U.S. at 57). RH does not direct me to any case of any court requiring a plaintiff to show actual harm to make a prima facie case of retaliation under Title VII. Without more, and in light of how the Third Circuit has interpreted *Burlington Northern*, I decline to impose such a requirement upon Lin.

### ii.    Causation

RH next contends Lin fails to make her prima facie case of retaliation because she cannot show a causal connection between her protected activity and the allegedly retaliatory RH actions.

The Third Circuit has held that a plaintiff may use evidence of ongoing antagonism between the parties to substantiate a causation link for purposes of the prima facie case. *See Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 288 (3d Cir. 2001); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997) ("The court could reasonably find that the initial series of events thus caused [the plaintiff] and [the defendant's] relationship to deteriorate, and set a pattern of behavior that [the defendant] followed in retaliating against [the plaintiff].").

---

[5] RH's invokes Judge Joyner's statement in *Lin I* that "this court does not believe that [the] defendant's lawful use of the state judicial system and its discovery process can be the basis of [the] plaintiff's claim of unlawful retaliation under Title VII." As discussed above, *Lin I* preceded the Supreme Court's decision in *Burlington Northern*.

Here, where the parties have been involved in an iterative series of disputes stemming back to Lin's 1997 performance review and her subsequent EEOC complaint, I conclude that the history of relations between the parties is sufficient for Lin to make her prima facie case, that is, show facial plausibility, with respect to causation.[6] [7]

### b. Pretext

The plaintiff having made a sufficient showing to establish a prima facie case of retaliation, under the *McDonnell Douglas* framework, the burden then shifts to RH to articulate a legitimate, nonretaliatory reason for the adverse action. "The defendant's burden at this stage is relatively light: it is satisfied if the defendant articulates any legitimate reason for the [adverse action]." *Woodson*, 109 F.3d at 920 n.2.

RH states in its motion that it asked the Court of Common Pleas to sanction Lin to enforce its 2003 methacrylic acid-related discovery requests, and that it asked the court to enjoin Lin and EverNu's work with methacrylic acid because its "decision-maker Vouros possessed a good-faith concern that strengthened over time into a good faith belief that Lin was using RH trade secrets/confidentiality information in the [methacrylic acid] project."[8] By way of explanation, RH states that "Vouros' concern had multiple bases, including but not limited to: the similarities of the DOE grant proposal abstract research (isobutene oxidation to methacrylic

---

[6] RH contends that a pattern of antagonism should not be sufficient to show causation for purposes of the prima facie case when the allegedly retaliatory actions relate to ongoing litigation. It may well be that there is often antagonism between parties engaged in an adversarial legal process, but I am not aware of a litigation-based exception to the Third Circuit's clearly established legal standards in this area. *See Abramson*, 260 F.3d at 288; *Woodson*, 109 F.3d at 920. In any event, the pattern of antagonism between RH and Lin preceded the Montgomery County Litigation.

[7] Whether Lin can eventually prove to the satisfaction of a fact-finder that her original complaint to the EEOC and the PHRA was the cause for the allegedly retaliatory litigation in Montgomery County and the communications to the DOE, which lasted for a period of many years thereafter, is, of course, an entirely different matter and is not before the court at this time.

[8] Although RH does not address why it initially pursued discovery regarding methacrylic acid in 2003, the 2003 discovery requests are no longer at issue in this case under my order of March 26, 2012.

acid) with RH research to which Lin was exposed; the overlap of acrylic acid research and methacrylic acid research in the New Routes group; his review of New Routes reports on MAA research that Lin received; and the input and concerns of two RH New Routes scientists, one of whom led the MAA research to which Lin was exposed." RH adds only that "Lin's selection of methacrylic acid yield/selectivity/conversion goals [as shown in its DOE grant application] that had been achieved by RH in 1999" and "the deposition of [RH research partner] Dr. [Charles] Strongin led Vouros to believe that Lin was using RH trade secrets/confidential information."

Regarding the DOE communications, RH states that "Vouros communicated with the DOE only when he learned generally of Lin's unauthorized disclosure of confidential RH documents with the communications focused on the return of RH property. Vouros also communicated to the DOE in 2008 to provide the default judgment order and request compliance with it."

Given that RH would be harmed if Lin were to use RH trade secrets for private profiteering, I find that RH's articulated reasons for investigating and opposing Lin's methacrylic acid work in the Montgomery County Litigation and in communications to the DOE meet the "relatively light" burden required at this stage of the analysis, and thus I will proceed to the next stage, pretext.

"[T]o defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, [nonretaliatory] reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious [retaliatory] reason was more likely than not a ... determinative cause of the employer's action." *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir. 1994). To discredit the employer's stated reason, a plaintiff such as Lin

"must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence and hence infer that the employer did not act for the asserted [nonretaliatory] reasons." *Id.* (internal quotation marks, brackets, and citations omitted).

According to Lin, RH has had no basis to believe that she stole or used any RH trade secrets in her work at EverNu. Looking to the record before me, although RH's nonretaliatory explanation is that it sought to defend RH trade secrets, RH points to nothing that would allow me to definitively conclude that RH trade secrets were in fact at issue in its dispute with Lin regarding methacrylic acid. There is therefore a genuine issue of material fact as to whether, as RH asserts, Vouros possessed a good faith belief that EverNu's methacrylic acid work implicated RH trade secrets when he directed RH's allegedly retaliatory actions.

Under Pennsylvania's Uniform Trade Secrets Act, 12 P.C.S.A. § 5302, a trade secret is:

Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:

(1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Meanwhile, the "crucial indicia for determining whether certain information constitutes a trade secret are substantial secrecy and competitive value to the owner." *O.D. Anderson, Inc. v. Cricks,* 815 A.2d 1063, 1070 (Pa. Super. Ct. 2003). To this effect, neither RH's motion nor its statement of material facts identifies any specific "formula . . . method, technique, or process" that it believes to be a trade secret implicated by Lin's research. *See* 12 P.C.S.A. § 5302. And although RH identifies areas of suspected overlap between its own methacrylic acid research and that of

EverNu, RH does not articulate a basis to believe the information at issue is characterized by "substantial secrecy and competitive value." *See O.D. Anderson, Inc.,* 815 A.2d at 1070. A reasonable jury could find that a trade secrets enforcement action is not genuinely motivated if the state court plaintiff does not identify actual trade secrets, and therefore the absence of record evidence showing the existence of RH trade secrets related to this dispute could cast substantial doubt on RH's proffered explanation.[9] Lin has therefore shown sufficient "weakness . . . in [RH]'s proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence and hence infer that [it] did not act for the asserted [nonretaliatory] reasons." *Fuentes,* 32 F.3d at 764. Having done so she need not present additional evidence of retaliation beyond her prima facie case for summary judgment purposes.

Because genuine issues of material fact remain regarding RH's motivations in investigation and opposing Lin's methacrylic acid research, summary judgment will not be granted on the basis that Lin cannot meet her burden under Title VII and the PHRA.

        **2.**    **Defenses**

           **a.**    **Right to Petition**

According to RH, "th[e] First Amendment Right to Petition . . . protects all of RH's actions at issue in this case and requires that summary judgment be granted to RH."[10] RH's argument is based on the *Noerr-Pennington* doctrine, so named for two Supreme Court cases limiting Sherman Act liability for anti-competitive petitioning activity to cases in which the

---

[9] In its motion, RH emphasizes the Third Circuit's statement that "the employment discrimination laws involved here permit an employer to take an adverse employment action for a reason that is not "true" in the sense that it is not objectively correct." *See Watson v. Se. Pennsylvania Transp. Auth.*, 207 F.3d 207, 222 (3d Cir. 2000). To this point, questions about Vouros' subjective intent are "particularly inappropriate for resolution by summary judgment, because evaluating state of mind often requires the drawing of inferences from the conduct of parties about which reasonable persons might differ." *Justofin v. Metro. Life Ins. Co.*, 372 F.3d 517, 523-24 (3d Cir. 2004) (internal quotation omitted).

[10] The First Amendment confers the right to "petition the government for a redress of grievances."

petition constitutes a sham. *See E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965); *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993). Contending that there is a *Noerr-Pennington*-type defense to anti-retaliation claims brought under Title VII, RH says it may not be held liable for its allegedly retaliatory petitioning activity so long as the activity had an objectively reasonable basis.[11]

     The Supreme Court explained in *Noerr* that "the right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms." *Noerr*, 365 U.S. at 138. And in 2002 the Supreme Court adopted a limited construction of the National Labor Relations Act ("NLRA") rather than reach the "difficult constitutional question" of whether it was constitutionally permissible to impose liability on objectively reasonable, retaliatory-motivated lawsuits. *See BE & K Const. Co. v. N.L.R.B.*, 536 U.S. 516, 536 (2002) ("Because there is nothing in the statutory text indicating that [it] must be read to reach all reasonably based but unsuccessful suits filed with a retaliatory purpose, we decline to do so."); *see also Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 932 n.6 (9th Cir. 2006) ("*BE & K* clarified that the principal application of the *Noerr–Pennington* doctrine is as a rule of statutory construction."). The Third Circuit, meanwhile, has also "by analogy extended the *Noerr-Pennington* doctrine to offer protection to citizens' petitioning activities in contexts outside the antitrust area." *We, Inc. v. City of Philadelphia*, 174 F.3d 322, 326-27 (3d Cir. 1999) (citing recognition of *Noerr-Pennington*-type defenses to claims for civil conspiracy under state tort laws and § 1983 claim for malicious prosecution).

---

[11] Lin does not dispute that RH's allegedly retaliatory litigation activities and/or communications with the DOE represent the petitioning of a department of government. *See Borough of Duryea, Pa. v. Guarnieri*, 131 S. Ct. 2488, 2494 (2011) ("The Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes.").

In considering whether there is a *Noerr-Pennington*-type defense to Title VII's anti-retaliation provision, I am guided first by the Third Circuit's 1999 decision in *Durham Life Ins. Co.*, in which a Title VII defendant argued that "filing a lawsuit against [the plaintiff] . . . cannot form the basis of a retaliation claim unless the lawsuit lacked a reasonable basis because of [the defendant's] First Amendment right to take disputes to the court." *See Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 157 (3d Cir. 1999). The defendant in *Durham Life* relied on *Bill Johnson's Restaurants*, a *BE & K* precursor in which the Supreme Court held that right to petition considerations prevented the NLRB from issuing a cease-and-desist letter against an employer's allegedly retaliatory prosecution of a state court lawsuit. *See Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 748 (1983). While resolving the case on independent grounds, the Third Circuit in *Durham Life* contrasted the NLRA and Title VII, explaining that *Bill Johnson's Restaurants* "construed a specific, ambiguous provision of the NLRA defining unfair labor practices" and that "*Bill Johnson's* reasoning has not been extended to Title VII, in part because the prohibition on retaliation is so explicit and the public policy behind the retaliation provision so compelling." *Id*. The Third Circuit has thus signified that the interpretive lodestars of text and purpose militate toward fully including retaliatory lawsuits in Title VII's anti-retaliation cause of action. *See also Burlington Northern*, 548 U.S. at 67 ("[I]nterpreting the [Title VII] anti-retaliation provision to provide broad protection from retaliation helps ensure the cooperation upon which accomplishment of the Act's primary objective depends.").

I am guided also by the Supreme Court's 2011 decision in *Borough of Duryea, Pa. v. Guarnieri*. *See* 131 S. Ct. 2488 (2011). In *Duryea*, the Supreme Court explained that "interpretation of the Petition Clause must be guided by the objectives and aspirations that underlie the right," emphasizing that the right to "petition [is] integral to the democratic process .

. . [by] allow[ing] citizens to express their ideas, hopes, and concerns to their government and their elected representatives." *See id.* at 2495. With the caveat that "constitutional protection for petitions does not necessarily turn on whether those petitions relate to a matter of public concern," the Supreme Court noted "the Constitution's special concern with threats to the right of citizens to participate in political affairs" and explained that "petitions to the government assume an added dimension when they seek to advance political, social, or other ideas of interest to the community as a whole." *See id.* at 2498. Holding that "the right of a public employee under the Petition Clause is a right to participate as a citizen, through petitioning activity, in the democratic process," the Supreme Court highlighted that the right to petition "is not a right to transform everyday employment disputes into matters for constitutional litigation in the federal courts." *See id.* at 2501.

Just as *Duryea* counsels that that the right to petition has the greatest force when a petition relates to the First Amendment's democracy-serving functions, the Third Circuit cases analogizing to *Noerr-Pennington* and extending its protections each involved a dispute concerning civic or public affairs. *See, e.g.*, *Brownsville Golden Age Nursing Home, Inc. v. Wells*, 839 F.2d 155, 159 (3d Cir. 1988) ("There can be no tortious action or impropriety when private citizens or public officials exercise their rights to notify the appropriate agencies or mobilize public opinion about a serious violation of the law."); *Herr v. Pequea Tp.*, 274 F.3d 109 (3d Cir. 2001) (holding First Amendment provided defense to municipal officials who petitioned a county planning commission to oppose an industrial development project); *In re Asbestos School Litigation*, 46 F.3d 1284 (1994) (holding First Amendment barred the defendant's liability for conspiracy or concert of action based on its participation in a public advocacy association); *Barnes Foundation v. Twp. of Lower Merion*, 242 F.3d 151 (3d Cir. 2001) (holding

First Amendment barred a § 1983 civil conspiracy claim against community residents who complained to city government about traffic and parking issues and potential zoning violations associated with neighborhood museum). Addressed to matters of public concern, the petitions in those cases stand in sharp contrast to the one at bar: a private trade secrets enforcement action bearing no relationship to political participation or civic engagement.

In light of *Durham Life* and *Duryea*, and the absence of specific authority to the contrary, I will not extend a *Noerr-Pennington*-type defense to Lin's claims under Title VII and the PHRA. Because "the prohibition on retaliation [in Title VII] is so explicit and the public policy behind the retaliation provision so compelling," *Durham Life*, 166 F.3d at 157, the bar is set high for a limiting construction. Regarding the underlying constitutional issues, a private dispute about trade secrets does not implicate the Petition Clause in the same manner as petitions that "seek to advance political, social, or other ideas of interest to the community as a whole." *Duryea*, 131 S. Ct. at 2498. Simply put, the right to petition "is not a right to transform everyday employment disputes into matters for constitutional litigation in the federal courts." *See id.* at 2501.

### b.    Litigation Privilege

RH next contends that Pennsylvania's judicial privilege doctrine shields it from liability for its motions in the Montgomery County Litigation. In Pennsylvania, "a person is entitled to absolute immunity for communications which are issued in the regular course of judicial proceedings and which are pertinent and material to the redress or relief sought." *Bochetto v. Gibson*, 580 Pa. 245 (2004).

Assuming that RH's motions in the Montgomery County Litigation constitute communications within the meaning of the Pennsylvania privilege, "a state absolute litigation

privilege purporting to confer immunity from suit cannot defeat a federal cause of action."
*Steffes v. Stepan Co.*, 155 F.3d 1070, 1074 (7th Cir. 1998); *see also Gibbons v. Ogden*, 22 U.S. 1, 211 (1824) ("The act of Congress, or the treaty, is supreme; and the law of the State, though enacted in the exercise of powers not controverted, must yield to it.").

The Supremacy Clause bars a defense to Title VII grounded in Pennsylvania's judicial privilege, and claims under the PHRA are interpreted coextensively with Title VII claims. *Atkinson*, 460 F.3d at 454 n.6. The defense sought by RH is unavailing.

### B.    Intentional Interference With Prospective Contractual Relations

In its motion, RH contends that Lin lacks standing to bring her claim for intentional interference with contractual relations, asserting that the alleged intentional interference presents claims for EverNu rather than Lin.

Lin responds that EverNu is her alter ego, an apparent reference to piercing the corporate veil. *See Trustees of Nat. Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 194 (3d Cir. 2003). In Pennsylvania, "the general rule is that a corporation shall be regarded as an independent entity even if its stock is owned entirely by one person." *Lumax Industries., Inc. v. Aultman*, 543 Pa. 38, 42 (1995). Meanwhile, "factors to be considered in piercing the corporate veil include: (1) gross undercapitalization, (2) failure to observe corporate formalities, (3) substantial mingling of corporate and personal affairs, and (4) using the corporate form to perpetrate a fraud." *Siematic Mobelwerke GmbH & Co. KG v. Siematic Corp.*, 643 F. Supp. 2d 675, 695 (E.D. Pa. 2009) (citing *Lumax Industries, Inc. v. Aultman*, 543 Pa. 38, 41 (1995) and *Village at Camelback v. Carr*, 538 A.2d 528, 533 (Pa. Super. 1988)). "The party seeking to pierce the corporate veil must carry its burden of proof by providing clear and convincing evidence in favor of piercing the corporate veil." *Id.*

Aside from her bare assertion that EverNu is her alter ego, Lin points to no evidence tending to show the corporate veil should be pierced, let alone by the clear and convincing standard that her burden of proof requires. Accordingly, Lin fails to "make a showing sufficient to establish the existence of . . . element[s] essential to [her] case, and on which [she] will bear the burden of proof at trial." *See Celotex*, 477 U.S. at 322.

I will grant the motion for summary judgment with respect to Lin's claim for intentional interference with prospective contractual relations.

### C.     Breach of Contract

In its motion, RH contends that Lin's claim for breach of contract is based on an alleged breach of paragraph 12 of the 1999 settlement agreement; that there is a four year statute of limitations for breach of contract under Pennyslvania law; and that Lin first became aware of the alleged breach of contract in 2003. According to RH, because Lin filed the instant action in 2011, she failed to bring her breach of contract claim within four years of awareness of the claim and her breach of contract claim is therefore time-barred.

In response, Lin contends that the settlement agreement contained a continuing obligation for her to protect RH trade secrets and that therefore she is permitted to sue for breaches of the settlement agreement that occurred in the four years preceding 2011. This response is unpersuasive: even if Lin has a continuing obligation under the agreement, this does not mean that RH has any continuing obligations under the agreement. In failing to point to evidence which would allow the court to make a reasonable inference that her action is not time barred, Lin does not "make a showing sufficient to establish the existence of [all] element[s] essential to that party's case, and on which that party will bear the burden of proof at trial." *See Celotex*, 477

U.S. at 322. Accordingly, I will grant the motion for summary judgment with respect to Lin's claim for breach of contract.

An appropriate order follows.