# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| DR. MANHUA MANDY LIN, | |
| Plaintiff, | |
| v. | CIVIL ACTION |
| ROHM AND HAAS COMPANY, | No. 11-3158 |
| Defendant. | |

## MEMORANDUM

YOHN, J.                                                    September 29, 2015

     Dr. Manhua Mandy Lin brings claims of retaliation under Title VII and the Pennsylvania Human Relations Act against Rohm and Haas, a chemical manufacturing company.[1]  From 1995 to 1999, Dr. Lin worked at Rohm and Haas as a senior scientist focused on developing a process to convert propane to acrylic acid (AA).  In 1999, after she had filed an EEOC charge of discrimination against Rohm and Haas, she left the company under an EEOC-mediated settlement agreement and agreed not to use or disclose any of its confidential information.

     In 2001, Rohm and Haas obtained a preliminary injunction against her in the Montgomery County Court of Common Pleas after a judge found that she had violated her confidentiality obligations by revealing AA-related information at a conference.  This injunction

---

[1] Rohm and Haas is now part of The Dow Chemical Company.

precluded her from using Rohm and Haas's confidential information and from publishing or presenting anything without first submitting it to the company for a trade-secret review.

In March 2003, Rohm and Haas discovered that in 2002 Dr. Lin had submitted a grant proposal to the Department of Energy (DOE) seeking funding for a project aimed at developing a process to convert isobutane to methacrylic acid (MAA).  Although she did not work directly in that research area while at Rohm and Haas, she was exposed to it in 1999, her last year there.

From 2003 to 2008, Rohm and Haas took numerous actions against Dr. Lin in the Montgomery County case and also communicated with the DOE about her.  Dr. Lin alleges that Rohm and Haas took these actions because of several EEOC charges that she had filed and pursued against the company after she left in 1999.  By contrast, Rohm and Haas contends that it took these actions for legitimate, non-retaliatory reasons, namely that it believed in good faith that she was improperly using its confidential information in the DOE-funded MAA project.

Over the course of an eleven-day bench trial, the parties offered testimony and exhibits in support of their arguments.  Having considered all of the evidence, I conclude that Dr. Lin has failed to show by a preponderance of the evidence that Rohm and Haas retaliated against her in violation of Title VII and the PHRA.  Under Federal Rule of Civil Procedure 52(a), I make the following findings of fact and conclusions of law in support of that decision.

## I.      Findings of Fact

### A.      Dr. Lin works at Rohm and Haas in AA

1.  From 1989 to 1999, Dr. Lin worked at Rohm and Haas, a chemical manufacturing company. For the latter half of her time there, she researched how to convert propane to AA and developed a new way to make a catalyst that produced a high yield of the chemical.

2.    In 1989, fresh off a PhD program and post-doctoral fellowship, Dr. Lin was hired by Rohm

and Haas to work as a senior scientist in the company's polymers division.  (Dr. Lin Test.,

Jan. 30, 2015.)  She worked in that division until late 1993 or early 1994, after which she was

transferred into the agricultural chemical research division for about a year.  (*Id.*)

3.    In 1995, Dr. Lin was transferred to Rohm and Haas's monomers division, where she became

a member of the New Routes Group.  (Dr. Lin Test., Feb. 2, 2015.)  This group strived to

develop new processes to lower Rohm and Haas's costs to manufacturer valuable chemicals.

(Dr. Han Test., Mar. 3, 2015.)  Rohm and Haas considered it one of the most important

research groups in the company, pouring millions of dollars into it throughout the 1990s.

(*Id.*; Dr. Lin Test., Feb. 2.)

4.    Upon her arrival, Dr. Lin was tasked with developing a way to convert propane to AA, which

was at the time a novel research area for her and Rohm and Haas.  (Dr. Lin Test., Jan. 30.)

For this reaction, she knew that she needed an effective catalyst, and so she started her

research by surveying the current landscape in that area.  (*Id.*)[2]  She learned that the

Mitsubishi Chemical Corporation had patented a mixed metal oxide (MMO) catalyst that,

according to its patent, could produce 48% AA from propane.  (*Id.*)  This was the highest

performing catalyst that she had discovered in her research.  (*Id.*)  It comprised as "essential"

elements molybdenum (Mo), vanadium (V), tellurium (Te), and niobium (Nb).  (Pl.'s Ex.

216; Dr. Han Test., Mar. 4, 2015.)[3]  In the New Routes Group, it was dubbed "MMO-1."

(Dr. Han Test. Mar. 4.)

---

[2] A catalyst is what causes the reaction to occur.  (Dr. Cavalcanti Test., Jan. 28, 2015.)  In this case, the reaction is called alkane oxidation: the process by which a catalyst oxidizes propane (an alkane) to produce acrylic acid.  (Dr. Han Test., Mar. 3; Dr. Cavalcanti Test., Jan. 28.)

[3] If an element is essential, it is required for the catalyst to operate.  (Patrick Hagan Test., Feb. 5, 2015.)  By contrast, an element can be "optional," meaning it is not essential for the catalyst to operate and can be absent.  (*Id.*)

5.  Dr. Lin thus first set out to replicate that catalyst and its high performance.  (Dr. Lin Test., Jan. 30.)  But she failed, at least initially: she would make the catalyst by following the process listed on the Mitsubishi patent, yet it would yield less than 5% AA—not 48% AA as listed on the patent.  (*Id.*)

6.  In October 1997, though, she experienced a breakthrough.  (*Id.*)  She produced the catalyst, and this time it yielded 42% AA, a yield comparable to the 48% listed on the Mitsubishi patent.  (*Id.*)  More importantly, she had discovered a way to make this high-performing catalyst that was not covered by the Mitsubishi patent.  (*Id.*; Dr. Han Test., Mar. 4.)

7.  In May 1998, Rohm and Haas filed a provisional patent application for Dr. Lin's discovery, listing her as an inventor.  (Def.'s Ex. 32.)  About a year later, its application was published, and on January 30, 2001, it was granted a patent on her discovery.  (*Id.*)

    **B.  Dr. Lin works with a modified MMO-1 catalyst and learns of its potential value in converting isobutane to MAA**

8.  From 1998 to 1999, after Rohm and Haas had filed the provisional patent application on her discovery, Dr. Lin continued to work with the MMO-1 catalyst in her AA research.  (Dr. Han Test., Mar. 4.)  She also, however, worked with a modified version of the catalyst in that research at the urging of Dr. Scott Han, one of her supervisors.  In addition, he conveyed to her the potential value of this new catalyst in converting isobutane to MAA, a research area at Rohm and Haas in which she was not involved but that the company was pursuing.

9.  In 1998, Dr. Han was hired as the "technical leader" of the New Routes Group.  (Dr. Han Test., Mar. 3.)  In this position, among other things, he provided technical guidance to the members of the group and helped lead its monthly meetings.  (*Id.*)

10. Soon after Dr. Han started, he and other New Routes Group scientists explored the concept of using a modified version of the MMO-1 catalyst to convert isobutane to MAA.  (Dr. Han

Test., Mar. 4.)  As stated earlier, the MMO-1 catalyst comprised as essential elements molybdenum (Mo), vanadium (V), tellurium (Te), and niobium (Nb).  Dr. Han and others believed that this catalyst was imperfect for converting isobutane to MAA.  (*Id.*)  A problem was that isobutane is more reactive than propane, and so the molybdenum in the catalyst can ruin the isobutane-to-MAA reaction because it is too strong of a metal.  (*Id.*)  Dr. Han and others thus thought that the MMO-1 catalyst could be modified to create a new, better catalyst for the reaction by partially substituting tungsten (W), a weaker metal, for molybdenum.  (*Id.*)  This modified MMO-1 catalyst contained five elements (WMoVTeNb), in contrast to the unmodified MMO-1 catalyst that contained four elements (MoVTeNb). (*Id.*)

11.  From 1998 to 1999, even though it fell outside of her research area, Dr. Lin learned about this modified MMO-1 catalyst's potential value in converting isobutane to MAA.  (*Id.*)  Dr. Han and other New Routes Group scientists discussed the concept in monthly meetings of the group that she attended, and Dr. Han talked about it one-on-one with her.  (*Id.*)

12.  Dr. Han also talked with her about the potential value of this modified MMO-1 catalyst in her research on converting propane to AA.  (*Id.*)  Although Dr. Han thought that the catalyst would work better for the isobutane-to-MAA reaction, he still felt that it might benefit the propane-to-AA reaction in a similar way.  (*Id.*)

13.  For that reason, he told Dr. Lin that she should test the catalyst in that reaction.  (*Id.*)  In October and November 1999, Dr. Lin's last months at Rohm and Haas, she worked extensively with the modified MMO-1 catalyst in her research on converting propane to AA. (*Id.*)  During that time, she prepared "thirty different compositions based on WMoVTeNb" and used them to convert propane to AA.  (Def.'s Ex. 22.)

### C.      Dr. Lin is exposed to Dr. Cavalcanti's confidential MAA research

14.    The modified MMO-1 catalyst was not Dr. Lin's only exposure to Rohm and Haas's MAA

research.  In 1999, Dr. Lin's last year at Rohm and Haas, Dr. Fernando Cavalcanti, a New

Routes Group colleague, had worked to develop a process for converting isobutane to MAA.

Though Dr. Lin worked in a different research area (propane to AA), she was privy to his

confidential MAA research through meetings, reports, and informal discussions.

15.    In February 1999, Dr. Cavalcanti started working in the New Routes Group as a senior

scientist in the area of MAA production.  (Dr. Cavalcanti Test., Jan. 28, 2015.)  Before Rohm

and Haas, he had worked for British Petroleum and was bound by a non-compete agreement

that, in effect, precluded him from working in AA for one year.  (*Id.*)  As a result, Rohm and

Haas decided that he would research how to convert isobutane to MAA, an area it was

already exploring but could now devote more resources to with his arrival.  (*Id.*; Def.'s Ex.

18.)  He became the leader of a subgroup within the New Routes Group focused in this area.

(Dr. Han Test., Mar. 3.)

16.    At the time, the New Routes Group was composed of various subgroups that each focused on

their own independent research programs.  (*Id.*)  Each subgroup was helmed by senior

scientists with PhDs, who had junior scientists and technicians reporting to them.  (*Id.*)  Both

Dr. Cavalcanti and Dr. Lin led subgroups: Dr. Lin's focused on converting propane to AA

whereas Dr. Cavalcanti's focused on converting isobutane to MAA.  (*Id.*)

17.    Each month, in mandatory meetings, subgroup leaders like Dr. Cavalcanti and Dr. Lin

presented their groups' research to the whole New Routes Group.  (*Id.*)  Displaying slides,

charts, and graphs, they apprised all New Routes Group members of their subgroups' most

recent research.  (*Id.*)  They told the group members about catalyst compositions, catalyst

performance, and catalyst production, and would also discuss the future direction of their subgroups' research.  (*Id.*)  These meetings were designed to foster discussion across different subgroups and to encourage the free flow of ideas throughout the whole New Routes Group.  (*Id.*)

18.  After the meetings, Dr. Han distributed a hard-copy packet to all group members with the slides from these presentations.  (*Id.*)  To compile the packet, he first collected copies of the presentations' slides from all subgroup leaders.  (*Id.*)  He then added a cover page in front of each subgroup's slides that displayed the subgroup leader's name to identify those slides as belonging to that subgroup.  (*Id.*)  Next, to ensure that all New Routes Group members received the packet, he tacked a master cover sheet to it with a distribution list.  (*Id.*)  He then sent the packet out to all New Routes Group members.  (*Id.*)

19.  In 1999, in addition to these monthly reports, the New Routes Group circulated quarterly reports to senior scientists like Dr. Cavalcanti and Dr. Lin.  (*Id.*; Dr. Cavalcanti Test., Jan. 28.)[4]  For these reports, subgroup leaders like Dr. Cavalcanti and Dr. Lin wrote detailed, technical summaries of their subgroups' most salient work and attached data to punctuate their points.  (Dr. Han Test., Mar. 3)  Of these summaries, the most notable ones were compiled in a report that was then sent to upper management and other senior-level employees.  (*Id.*)  This report then flowed to senior scientists like Dr. Cavalcanti and Dr. Lin: a research manager for the group circulated a hard copy of the report among these scientists; each scientist reviewed the copy, scratched his or her name off a distribution list, and passed it to the next scientist on the list.  (Dr. Cavalcanti Test., Jan. 29, 2015.)

---

[4] These quarterly reports were based on the calendar year.

20. Rohm and Haas considered the monthly and quarterly reports to be highly confidential.  (Dr. Cavalcanti Test., Jan. 28; Dr. Han Test., Mar. 3.)  On the cover page of the monthly reports, Rohm and Haas requested that "this package of slides be treated with the strictest confidentiality," because "these slides cover the most recent work within the New Routes Group."  (Def.'s Ex. 17.)  It also stamped each page with "Rohm and Haas Confidential" and "Confidential."  (*Id.*)  Likewise, it stamped each page of the quarterly reports with "Rohm and Haas Confidential."  (*Id.*; Def.'s Ex. 22.)

21. Against this backdrop, Dr. Cavalcanti researched how to convert isobutane to MAA and disseminated confidential information about that research to Dr. Lin (and other New Routes Group members) from February 1999 to November 1999, which was the time that he overlapped with her at Rohm and Haas.[5]  And during this time, he focused on developing and studying catalysts for converting isobutane to MAA in one step.

22. In early 1999, to begin his research, Dr. Cavalcanti collected from Dr. Lin and other New Routes scientists the best catalysts they had prepared for different catalytic reactions in their respective subgroups.  (Dr. Cavalcanti Test., Jan. 28; Dr. Cavalcanti Test., Jan. 29; Def.'s Ex. 17.)  He wanted to test how these catalysts worked for converting isobutane to MAA.  (Def.'s Ex. 17.)  From Dr. Lin, he collected the MMO-1 catalyst—the MMO catalyst that her group used for converting propane to AA—and explained to her his plans for it.  (*Id.*; Dr. Cavalcanti Test., Jan. 28.)  He also collected a different MMO catalyst from another scientist. (Def.'s Ex. 17.)  From two other scientists, he collected a polyoxometallate (POM) and a

---

[5] Except for the fourth quarter 1999 report, Dr. Lin has stipulated to receiving all of the New Routes Group's monthly and quarterly reports introduced in this case.  (Dr. Lin Test., Jan. 30; Dr. Lin Test., Feb. 2; Dr. Cavalcanti Test., Jan. 29.)   She also conceded that she attended the monthly meetings during this time.  (Dr. Lin Test., Jan. 30.)

"POM-like" catalyst. (*Id.*)[6]  He discussed these efforts in monthly meetings attended by Dr. Lin and in the first and second quarter reports that were received by Dr. Lin.

23. During the second quarter of 1999, Dr. Cavalcanti tested these catalysts to evaluate their efficacy at converting isobutane to MAA.  (*Id.*)  He learned that the POM and POM-like catalysts far outperformed the MMO catalysts in terms of MAA yield, though they performed at this high level for only a short time.  (*Id.*)  Nevertheless, because they produced the "best results," he started a program to synthesize new POMs and use them as intact catalysts or as precursors to MMO catalysts.  (*Id.*)[7]  He reported all of this confidential information in monthly meetings attended by Dr. Lin and in the May monthly report and the second quarter report that were received by Dr. Lin.

24. In the third quarter of 1999, Dr. Cavalcanti worked not only with POMs but also with MMOs.  (*Id.*)  In his work with POMs, he tested ones that he had synthesized for use as intact catalysts or as precursors to MMO catalysts.  (*Id.*)  In his work with MMOs, he analyzed the structure-performance relationship of various MMO catalysts performing the reaction, including the MMO-1 catalyst and some new MMOs that he had prepared.  (*Id.*; Dr. Cavalcanti Test., Jan. 29.)  With this structure-performance analysis, he endeavored to understand the correlation, if any, between the MMO catalysts' structure and their performance of the reaction.  (Dr. Cavalcanti Test., Jan. 29.)  From one such analysis, he concluded that the "evidence . . . offers a great window of opportunity for the synthesis of new catalysts."  (Def.'s Ex. 17.)  He conveyed this confidential information in monthly meetings attended by Dr. Lin and in the third quarter report that was received by Dr. Lin.

---

[6] "POM-like catalyst" is a term that Dr. Cavalcanti used to inform people "that the catalyst was not a POM and that it might be a[n MMO]."  (Dr. Cavalcanti Test., Jan. 28.)

[7] When Dr. Cavalcanti used a POM as a precursor to an MMO, he took a POM that he had synthesized, and he treated it in such a way that it transformed into an MMO.  (Dr. Cavalcanti Test., Jan. 28.)

25.   In the fourth quarter of 1999, Dr. Cavalcanti tested both POM and MMO catalysts.  (Def.'s

Ex. 18.)  From this testing, he identified "[a]t least a couple of materials in each class . . . as

having the potential for further development with respect to the partial oxidation of

isobutane."  (*Id.*)  In the fourth quarter report, he conveyed these results in two sections: (1)

"Isobutane To Methacrylic Acid Via Polyoxometallate [POM] Catalysts (FC Group)" and (2)

"Isobutane To Methacrylic Acid Via Mixed-Metal Oxide Catalysts (FC Group)."  (*Id.*)  Dr.

Lin did not receive this report, distributed in February 2000, because she had left Rohm and

Haas on November 30, 1999, but she was still exposed to some of its research through the

October monthly meeting and report.  (Dr. Lin Test., Feb. 2.)  For example, in the October

report, Dr. Cavalcanti revealed the testing results of some POM and MMO catalysts,

including a promising MMO catalyst.  (Def.'s Ex. 17; Dr. Cavalcanti Test., Jan. 29.)

26.   Outside of these formal channels, Dr. Cavalcanti conveyed confidential MAA information to

Dr. Lin through their day-to-day conversations.  They worked in the same lab in the same

building, and they visited each other in their respective offices to talk about their research.

(Dr. Cavalcanti Test., Jan. 28.)  In fact, Dr. Cavalcanti credibly testified that he shared with

Dr. Lin technical details about his MAA research.  (*Id.*)

### D.      Dr. Lin leaves Rohm and Haas under obligations of confidentiality

27.   At the end of 1999, Dr. Lin left Rohm and Haas under an EEOC settlement and agreed,

among other things, not to use or disclose any of Rohm and Haas's confidential information.

28.   Earlier that year, in January, she had filed an EEOC charge against Rohm and Haas.  (Dr. Lin

Test., Jan. 30.)  She alleged that, after she had requested a promotion for developing the

unique way to manufacture the MMO-1 catalyst, a Rohm and Haas manager denied her

request, likening her to a "monkey" that had accidentally invented something.  (*Id.*)

29. In November 1999, following an EEOC mediation, Dr. Lin and Rohm and Haas agreed to settle the charge.  (Pl.'s Ex. 84.)  As part of that agreement, Rohm and Haas promised to pay her $100,000 and promote her to a higher grade.  (*Id.*)  In exchange, she agreed to release her claim against Rohm and Haas and to leave the company at the month's end.  (*Id.*)

30. As part of the settlement agreement, she also reaffirmed certain post-employment confidentiality obligations that she had agreed to when she started at Rohm and Haas.  (*Id.*)  In 1989, she had signed a "Worldwide Confidentiality and Employment Agreement," promising to keep as confidential all of Rohm and Haas's trade secrets and confidential information, and "not [to] use such information other than in an authorized manner in the course of Rohm and Haas' business."  (*Id.*; Dr. Lin Test., Feb. 2.)  She had also agreed "not [to] divulge such information to outsiders or other unauthorized persons" after leaving Rohm and Haas.  (Pl.'s Ex. 84.)  By signing the settlement agreement, she "agree[d] to the[se] obligations set forth in the Rohm and Haas Worldwide Confidentiality and Employment Agreement . . . specifically including the post-separation provisions."  (*Id.*)

31. In addition, Dr. Lin incorporated into her settlement agreement an acknowledgment that set out additional details about her post-employment confidentiality obligations.  (*Id.*)  Titled "Departing Employee Notice and Acknowledgement of Continuing Obligations," it "confirm[ed] [her] obligation not to use or disclose without prior consent any confidential information," which is "any non-public information which could be used for a competitive advantage that [she] acquired during [her] tenure at Rohm and Haas."  (*Id.*)  This included information that she "carr[ied] away in [her] memory" such as "knowledge relating to the development, testing, formulation, manufacture and marketing of Rohm and Haas products."

(*Id.*)  As part of her settlement agreement, she promised that this acknowledgment "shall remain in full force and effect and be incorporated into this Agreement."  (*Id.*)

32.  On November 30, 1999, Dr. Lin left Rohm and Haas.  (Dr. Lin Test., Jan. 30.)

### E.  Dr. Lin reveals Rohm and Haas's confidential information on AA

33.  Even though Dr. Lin was bound by the confidentiality obligations in the settlement agreement, she was also permitted under the agreement to present and publish on her work at Rohm and Haas.  (Pl.'s Ex. 84.)  But she could do so only if Dr. Han first certified that the material revealed no company trade secrets.  (*Id.*)  If a dispute arose between Dr. Han and her over the material, she agreed that Dr. Charles Tatum, Chief Technology Officer, would conduct an additional review.  (*Id.*)  In March 2000, though, she presented material at a San Francisco conference that both Dr. Han and Dr. Tatum had forbidden her from revealing.

34.  Back on November 11, 1999, a few weeks before Dr. Lin left Rohm and Haas, she and Dr. Han had met to discuss her future publications and presentations that would be based on her work at the company.  (Pl.'s Ex. 154.)  During their meeting, Dr. Han agreed that Dr. Lin could give a presentation in San Francisco in March 2000 at an American Chemical Society (ACS) conference.  (*Id.*)  At that conference, Dr. Lin planned to discuss some of her work with the MMO-1 catalyst and AA.  (*Id.*)  Dr. Han, however, told her that she could present only data from 1996 because he knew that it did not expose any Rohm and Haas trade secrets.  (*Id.*; Def.'s Ex. 1.7.)

35.  On March 21, 2000, a week before her presentation, Dr. Lin sent Dr. Han an email with an outline of slides for her presentation.  (Pl.'s Ex. 154.)  After reviewing her slides, Dr. Han was concerned because, contrary to their earlier agreement, they seemed to reveal post-1996 data.  (*Id.*)  With the presentation just a week away, he told Dr. Lin that he did not have

enough time to review the post-1996 data.  (Dr. Han Test., Jan. 30.)  He, too, was going to

the ACS conference and would be occupied with other business, leaving him only a few days

to review the data.  (*Id.*)  As a result, he told Dr. Lin that she could not present the

information at the conference.  (*Id.*)

36.   Dr. Lin disagreed, so Dr. Han asked Dr. Tatum to review her presentation and decide if it

      was acceptable.  (Pl.'s Ex. 154.)  The next day, Dr. Tatum rejected Dr. Lin's presentation,

      and Dr. Han called her a day later to tell her.  (*Id.*)  She was defiant, but Dr. Han told her that

      Rohm and Haas would consider legal action if she presented the post-1996 data.  (*Id.*)

37.   On March 28, 2000, with Dr. Han sitting in the audience, Dr. Lin gave her presentation and

      revealed the post-1996 data.  (Dr. Han Test., Jan. 30; Pl.'s Ex. 163.)

38.   The next day, she opened a letter that Dr. Han had handed to her before her presentation.

      (Dr. Lin Test., Jan. 30; Pl.'s Ex. 158.)  In the letter, an in-house attorney for Rohm and Haas

      reminded her of the provision in the settlement agreement requiring her to abide by Dr.

      Tatum's final decision on her presentation.  (Pl.'s Ex. 158.)  He also told her that she would

      violate her confidentiality agreement if she presented the post-1996 data.  (*Id.*)  In closing, he

      warned her that Rohm and Haas would "consider legal action against [her]" if she presented

      the data.  (*Id.*)

39.   A few days later, on April 2, 2000, Dr. Lin wrote a letter to the EEOC complaining about

      Rohm and Haas's efforts to bar her from presenting the post-1996 data.  (Pl.'s Ex. 87.)

      Claiming that Rohm and Haas had violated the EEOC-mediated settlement agreement with

      these efforts, she urged the EEOC to take action against the company.  (*Id.*)

### F.      Rohm and Haas is awarded a preliminary injunction against Dr. Lin

40.   A month later, on June 2, 2000, Rohm and Haas sued Dr. Lin in the Montgomery County

Court of Common Pleas over her ACS presentation.  (Pl.'s Ex. 163.)  The Honorable Bernard

A. Moore awarded it a preliminary injunction against Dr. Lin, finding that she not only had

disclosed its trade secrets in her ACS presentation but also had taken its confidential

documents with her before leaving the company.

41.   In its June 2000 complaint, Rohm and Haas alleged that Dr. Lin had disclosed confidential

information in violation of her fiduciary and contractual duties to the company.  (*Id.*)  It

requested damages and an injunction "enjoining [her] from using, disclosing or converting

Rohm and Haas' confidential information or trade secrets."  (*Id.*)

42.   Dr. Lin then hired Hugh Hutchison, Esquire to represent her.  (Hugh Hutchison Test., Mar. 2,

2015.)

43.   On April 17, 2001, after nine days of hearings, Judge Moore awarded Rohm and Haas a

preliminary injunction that stated in relevant part:

> 1. Dr. Lin is enjoined from using, disclosing or divulging, directly or indirectly,
> any information that Rohm and Haas considered confidential or trade secret; [and]
>
> 2. Dr. Lin is enjoined from making, releasing or disclosing any proposed
> scientific presentation or publication unless, after a 90-day trade secret review by
> Dr. Scott Han and/or Dr. Charles Tatum, the parties agree that such presentation
> or publication contains no Rohm and Haas trade secrets[.]

(Def.'s Ex. 1.5.)

44.   About a month later, Judge Moore issued an opinion in support of his order.  (Def.'s Ex. 1.7.)

Concluding that Dr. Lin had disclosed Rohm and Haas's trade secrets in her ACS

presentation, he asserted that she had violated her contractual obligations of confidentiality.

(*Id.*)  He also found that before leaving Rohm and Haas, she had "copied hundreds of

confidential Rohm and Haas documents onto high-storage-capacity computer disks." (*Id.*) Judge Moore therefore held that Rohm and Haas was entitled to a preliminary injunction barring Dr. Lin from further misusing its confidential information. (*Id.*)

45. On February 20, 2003, the Superior Court affirmed Judge Moore's preliminary injunction, concluding that "the preliminary injunction entered in this case represents a balanced response to the evidence of record." (Def.'s Ex. 1.8.)

### G. Dr. Lin pursues retaliation charges against Rohm and Haas

46. Meanwhile, while Rohm and Haas was obtaining and then preserving its preliminary injunction, Dr. Lin had leveled her second and third EEOC charges against the company. After she then unsuccessfully pursued these charges in federal court, she filed her fourth EEOC charge against Rohm and Haas, which is the charge underlying this case.

47. On June 19, 2000, just over two weeks after Rohm and Haas had sued her in Montgomery County, Dr. Lin filed her second EEOC charge against the company. (Pl.'s Ex. 122.)[8] She claimed that it had violated the 1999 EEOC-mediated settlement agreement by trying to stop her from presenting on her research. (*Id.*) She also contended that, by filing the Montgomery County lawsuit, it had retaliated against her for the letter she had written to the EEOC complaining about its efforts to stop her from presenting at the ACS conference. (*Id.*)

48. Then, on August 21, 2001, about four months after Judge Moore had issued his preliminary injunction, Dr. Lin filed her third EEOC charge against Rohm and Haas. (Pl.'s Ex. 112.) She alleged that it had again retaliated against her, this time by dragging its feet when she requested non-confidential data and a trade-secret review of a presentation she planned to give in Chicago. (*Id.*)

---

[8] The first charge was the one in 1999 that led to her departure from Rohm and Haas. Although after the ACS presentation she wrote the letter to the EEOC about Rohm and Haas's actions, it was not an official EEOC charge.

49.  In June 2002, Dr. Lin sued Rohm and Haas in this district based on her second and third

EEOC charges (*Lin I*).  She was again represented by Hutchison; Rohm and Haas was

primarily represented by Raymond Kresge, one of its lawyers in this case.  (Hugh Hutchison

Test., Mar. 2; James Vouros Test., Jan. 28, 2015.)  She claimed, in large part, that Rohm and

Haas had pursued its preliminary injunction against her because of her EEOC charges, a

course of action that she claimed violated the retaliation provisions of Title VII and the

PHRA.  (Complaint, *Lin v. Rohm & Haas Co.*, 301 F. Supp. 2d 403 (E.D. Pa. 2004).)

50.  In January 2004, the Honorable J. Curtis Joyner granted summary judgment to Rohm and

Haas on these retaliation claims, holding that its injunction action against Dr. Lin was not an

"adverse employment action" under Title VII, as it did not materially alter her future

employment prospects or conditions.  (*Lin I*, 301 F. Supp. 2d at 405–06.)[9]  On July 27, 2004,

he denied Dr. Lin's second and final motion for reconsideration, effectively ending *Lin I*.

51.  A few months later, in May or June 2004,[10] Dr. Lin filed her fourth EEOC charge.  (Pl.'s Ex.

126.)  She again alleged that Rohm and Haas was retaliating against her because of her

EEOC charges, though this time by serving burdensome discovery requests in the

Montgomery County case on both her and EverNu Technologies, an LLC that she had

formed to pursue her research.  (*Id.*)[11]  In March 2011, the EEOC issued Dr. Lin a right-to-

sue letter, spawning this case.  (Compl., Ex. C.)

---

[9] His decision, however, preceded *Burlington Northern and Sante Fe Railway Co. v. White*, 548 U.S. 53 (2006), a case in which the Supreme Court established a broader standard for determining what constitutes an adverse employment action.  So as I will explain further in my conclusions of law, under this extant standard, Dr. Lin has shown that Rohm and Haas's actions in Montgomery County after *Lin I* are adverse employment actions.

[10] Dr. Lin contends that she filed this charge on May 20, 2004, whereas Rohm and Haas contends that she filed it on June 30, 2004. This factual dispute is immaterial.

[11] The events leading up to Rohm and Haas's serving of these discovery requests are discussed at length in the next part.  Also alleged by Dr. Lin to be retaliatory and to be part of her fourth EEOC charge are many events that followed these 2003 discovery requests. These events are discussed at length in Parts I.I, I.J, I.K, I.M, I.O, and I.Q.

H.      **Rohm and Haas seeks MAA-related discovery in the Montgomery County case**

52. Dr. Lin's fourth EEOC charge stemmed from discovery requests that Rohm and Haas had served on her and EverNu in April and August 2003, over two years after Judge Moore had issued the preliminary injunction.  During that time, Rohm and Haas was changing course in the Montgomery County case, shifting its focus from Dr. Lin's AA-related disclosures at the ACS presentation to her MAA-related work with EverNu.

53. In 2003 and beyond, Rohm and Haas directed the Montgomery County case mostly through two lawyers: one outside and one inside.  Mari Shaw, lead outside counsel, had been involved with the case since its inception in 2000.  (Pl.'s Ex. 163; James Vouros Test., Mar. 4, 2015.)  On the inside, James Vouros managed the case for Rohm and Haas; he was a lawyer in its intellectual property department charged with protecting the company's confidential information.  (James Vouros Test., Mar. 4.)[12]  He had generally overseen the case from the beginning, but in 2002 his role shifted, and he assumed management of the case's day-to-day activities.  (*Id.*)  In this role, he supervised Shaw and other outside lawyers in the case, approving most of their filings and actions.  (James Vouros Test., Jan. 26, 2015.)

54. On March 13, 2003, Vouros learned that Dr. Lin had sought DOE funding for an MAA project.  While searching a DOE website, an outside lawyer for Rohm and Haas had discovered an abstract to a Phase I grant proposal written by Dr. Lin, and he forwarded it to Vouros.  (*Id.*; James Vouros Test., Mar. 4; Def.'s Ex. 19.)  The abstract identified Dr. Lin as the principal investigator for a project titled "Metal Oxide Catalyst for Methacrylic Acid Preparation via One-Step Oxidation of Isobutane."  (Def.'s Ex. 19.)  It described the first

---

[12] Vouros was also involved in *Lin I*, the case that arose from Dr. Lin's second and third EEOC charges.  In the spring of 2003, he was deposed in that case, and he also supervised the depositions of three Rohm and Haas scientists, including Dr. Han.  (James Vouros Test., Mar. 3.)  As a result, he knew of Dr. Lin's second and third EEOC charges at this time.

phase as follows: "Phase I will prepare various catalysts of the WaMobVcXdYeOn composition (X and Y are modifiers for isobutane activation and methacrylic acid selectivity), study the preparation-structure-performance relationship, and optimize for the most active catalysts for the conversion of isobutane to methacrylic acid." (*Id.*)

55.   Vouros also read in the abstract that Dr. Lin had listed EverNu as the entity that was to receive the grant money. (James Vouros Test., Mar. 4.) Incorporated in 2000, EverNu was Dr. Lin's single-member LLC. (Def.'s Ex. 1.4; Dr. Lin Test., Feb. 2.) In August 2000, though, Dr. Lin had stated in an interrogatory answer in the Montgomery County case that in "June, 2000, EverNu Technology stopped all of its on-going business activities." (Def.'s Ex. 1.4.) Vouros knew of this answer, and because Dr. Lin had not amended it, he thought that EverNu was not operating anymore—until he saw the DOE grant abstract in March 2003. (Dr. Lin Test., Feb. 2; James Vouros Test., Mar. 4; Hugh Hutchison Test., Mar. 3, 2015.)

56.   Vouros believed that Dr. Lin had violated Judge Moore's preliminary injunction by submitting this grant request. (James Vouros Test., Mar. 4.) Judge Moore had enjoined Dr. Lin "from making, releasing or disclosing any proposed scientific presentation or publication unless, after a 90-day trade-secret review by Dr. Scott Han and/or Dr. Charles Tatum, the parties agree that such presentation or publication contains no Rohm and Haas trade secrets." (Def.'s Ex. 1.5.) Vouros thought this portion of the injunction encompassed the grant request and that she had violated it by submitting the grant request without a Rohm and Haas trade-secret review. (James Vouros Test., Mar. 4.)

57.   Vouros asked Dr. Han for his opinion on the abstract. (Def.'s Ex. 19; Dr. Han Test., Mar. 4.) On a phone call, Dr. Han told him that he was concerned by two areas in the document. (Dr. Han Test., Mar. 4.) He said that the project's title—"Metal Oxide Catalyst for Methacrylic

Acid Preparation via One-Step Oxidation of Isobutane"—summarized Dr. Cavalcanti's research focus during Dr. Lin's last year at Rohm and Haas.  (*Id.*)  He also told Vouros that the catalyst described in the abstract—"WaMobVcXdYeOn (X and Y are modifiers for isobutane activation and methacrylic acid selectivity)"—resembled the tungsten-modified MMO-1 catalyst (WMoVTeNb) that Dr. Lin had worked with in her final days at Rohm and Haas.  (*Id.*)  Of particular concern to Dr. Han was the "tungsten [W] and molybdenum [Mo] together indicating joint substitution type."  (*Id.*)

58. Dr. Cavalcanti also weighed in.  (Dr. Cavalcanti Test., Jan. 29.)  He, too, told Vouros that he was concerned by the abstract's title because it described the area in which he was working at the end of Dr. Lin's time at Rohm and Haas.  (*Id.*)  He also conveyed to Vouros that he was concerned by the catalyst described in the abstract, for it overlapped with catalyst compositions that he had worked with in 1999.  (*Id.*)  And he noted to Vouros that Dr. Lin was proposing to study preparation-structure-performance relationships of catalysts, an analysis that could draw on information from his own structure-performance studies in 1999. (*Id.*)

59. On April 8, 2003, Rohm and Haas served Dr. Lin with interrogatories and document requests related to the grant abstract in the Montgomery County action.  (Def.'s Exs. 1.10, 1.11.) Filed by Shaw, they focused on Dr. Lin's communications with the DOE about the MAA grant and any other DOE grants.  (*Id.*)

60. A month later, Dr. Lin answered these requests but provided nothing.  (Def.'s Ex. 53.)  She objected to them, asserting that Rohm and Haas was seeking confidential and proprietary information that belonged to a non-party, EverNu.  (*Id.*)

61.   The next month, on June 27, 2003, Rohm and Haas filed motions to compel.  (Pl.'s Ex. 173.)

On August 11, 2003, Judge Moore granted them, ordering Dr. Lin to produce this

information "or appropriate sanctions shall be imposed . . . following application to the

Court."  (Def.'s Exs. 1.12, 1.13.)

62.   Yet Dr. Lin still refused to produce any documents, and around August 22, 2003, Rohm and

Haas served EverNu with a subpoena.  (Def.'s Ex. 1.14.)  Rohm and Haas demanded that

EverNu produce a corporate designee for a deposition.  (*Id.*)  It also told EverNu to produce

all documents related both to the company's business and to its technical activities.  (*Id.*)

63.   Dr. Lin's testimony that she and EverNu never maintained contemporaneous research

records/data and never maintained lab notebooks for Phase I of the DOE grant work because

lab notebooks were too expensive is not credible.  Lab notebooks are not expensive.

64.   Rohm and Haas promised EverNu that it would keep its information confidential.  (*Id.*)  Back

on June 21, 2000, a few weeks after Rohm and Haas had sued Dr. Lin, both parties had

signed a "Stipulation of Confidentiality," agreeing to maintain as confidential any

information produced and so designated by either party in the case.  (Def.'s Ex. 1.2.)  Each

party promised to use this information only for preparing for trial, and not to disseminate it to

anyone outside of the case without the other party's prior consent.  (*Id.*)  Even though

EverNu was not a party to this stipulation, Rohm and Haas in its subpoena stated that the

agreement would cover EverNu's testimony and documents.  (Def.'s Ex. 1.14.)

65.   After being served with the subpoena, EverNu hired a lawyer, John Chesney.  (Dr. Lin Test.,

Jan. 30.)  It then moved for Judge Moore to quash the subpoena of Rohm and Haas and to

grant it a protective order.  (Pl.'s Ex. 47.)  As part of its proposed protective order, it

requested, among other things, that Judge Moore appoint a discovery master to determine

which documents were suitable for production.  (*Id.*)  On December 13, 2003, Judge Moore denied the motion.  (Def.'s Ex. 1.16.)  Dr. Lin could give no credible explanation for not allowing Judge Moore to decide the discovery disputes.  When her motion to have a discovery master was denied by Judge Moore she again decided not to provide any discovery.  She gave no explanation, even when I questioned her specifically, as to why she would provide discovery to a master but not to the judge.

66. Dr. Lin consistently refused to comply with the Montgomery County court's discovery orders and refused to provide any relevant discovery, even after Rohm and Haas's offer of a confidentiality agreement.  Nor did she suggest any amendments to the confidentiality order.

### I.     Rohm and Haas seeks attorney fees from EverNu

67. In July 2004, Rohm and Haas moved for attorney fees after EverNu had presented information at an exhibition without first submitting it for a trade-secret review.

68. In April 2004, EverNu was scheduled to present at a DOE-sponsored exhibition in New Orleans.  (Dr. Lin Test., Feb. 2.)  It planned to display a poster on some of its DOE-funded work.  (*Id.*)

69. Before the exhibition, Chesney wrote to Shaw asking if Rohm and Haas would agree that EverNu's information was not bound by the preliminary injunction.  (*Id.*)  As stated earlier, Rohm and Haas's 2001 preliminary injunction against Dr. Lin precluded her from, among other things, making any scientific presentation without first submitting it to Rohm and Haas for a ninety-day trade-secret review.  Rohm and Haas denied Chesney's request.  (*Id.*)

70. So EverNu, a few days before the presentation, filed with Judge Moore an emergency motion for clarification of the preliminary injunction.  (*Id.*)  It requested that he hold that it was not bound by the injunction's trade-secret review requirement, clearing the way for it to present

at the exhibition.  (*Id.*)  Both sides briefed the issue; they argued it in court.  (*Id.*; Def.'s Ex. 1.18)  On April 26, 2004, Judge Moore denied EverNu's motion.  (Def.'s Ex. 1.18.)

71.   Before EverNu was to present in New Orleans, Chesney told Dr. Lin that Judge Moore had denied the motion.  (Dr. Lin Test., Feb. 2.)   She presented the poster anyway.  (*Id.*)

72.   On July 26, 2004, Rohm and Haas moved for attorney fees for the costs it had expended in opposing EverNu's motion to clarify the preliminary injunction.  (Pl.'s Ex. 177.)

**J.      Rohm and Haas pursues sanctions against Dr. Lin and EverNu**

73.   From 2004 to 2008, Rohm and Haas obtained sanctions against Dr. Lin and EverNu for their refusal to provide any discovery.  These sanctions did not produce their desired effect.

74.   On September 13, 2004, with Dr. Lin and EverNu still refusing to produce any discovery despite Judge Moore's orders, Rohm and Haas filed motions for sanctions against them. (Pl.'s Exs. 49, 81.)  It requested that Judge Moore order them to produce all outstanding discovery, to pay a fine for each day they failed to comply, and to pay attorney fees.  (*Id.*)

75.   Several months later, on January 10, 2005, Judge Moore granted these motions.  (Def.'s Exs. 1.19, 1.20.)  He ordered Dr. Lin and EverNu to produce all outstanding discovery and awarded Rohm and Haas $2,000 in attorney fees, though he declined to order them to pay a daily fine for noncompliance.  (*Id.*)  He gave them thirty days to comply.  (*Id.*)

76.   Thirty days later, Rohm and Haas was still empty handed.  Then, on February 11, 2005, it filed a motion for more sanctions against EverNu, seeking fines for each day that it failed to produce both its documents and a corporate designee for a deposition.  (Pl.'s Ex. 62.)  About a month later, the situation unchanged, it filed another motion for sanctions against EverNu—and Dr. Lin, too.  (Pl.'s Ex. 67.)  This time, in addition to monetary sanctions, it sought an order bestowing on it EverNu's MAA intellectual property and precluding Dr. Lin

and EverNu from defending against its claim that they were using its trade secrets in EverNu's DOE-funded MAA work.  (*Id.*)  It also requested permission to submit to the DOE any documents relevant to an agency investigation of the matter, regardless of whether they were confidential or subject to the parties' "Stipulation of Confidentiality."  (*Id.*)

77.   On June 2, 2005, Judge Moore awarded Rohm and Haas all of its requested relief, except for the rights to EverNu's MAA intellectual property.  (Def.'s Ex. 1.22.)

78.   Dr. Lin and EverNu once again balked at Judge Moore's orders, and on September 12, 2005, Rohm and Haas filed a motion for partial summary judgment.  (Pl.'s Ex. 157.)  It requested that Judge Moore order Dr. Lin and EverNu to assign to it any MAA intellectual property that had originated from DOE grants.  (*Id.*)  It also asked that Judge Moore permanently enjoin Dr. Lin from researching MAA and also enjoin her for five years from publishing or presenting anything without a ninety-day trade-secret review.  (*Id.*)  In February 2006, Judge Moore denied this motion.  (James Vouros Test., Mar. 6, 2015.)

79.   Later that month, Rohm and Haas filed a motion to aggregate the fines and attorney fees that Dr. Lin and EverNu owed and to award it more fines and attorney fees.  (Pl.'s Ex. 63.)  On May 30, 2006, Judge Moore granted this motion, ordering Dr. Lin to pay $32,000 within five days and asserting that the daily fines he had imposed with his June 2, 2005, order would persist until she complied with discovery.  (Def.'s Ex. 1.27.)  In a separate order, he entered judgment against EverNu and in favor of Rohm and Haas for $32,000.  (Def.'s Ex. 1.28.)

80.   Dr. Lin and EverNu continued not to pay or to comply with discovery, and on June 30, 2006, Rohm and Haas filed with the prothonotary a praecipe for entry of judgment on Judge Moore's May 30, 2006, sanctions orders.  (Def.'s Ex. 62.2; James Vouros Test., Mar. 4; Dr. Lin Test., Feb. 4, 2015.)  In July 2006, Rohm and Haas served Dr. Lin with writs of

execution against EverNu's bank account, causing the bank to freeze the account.  (Pl.'s Ex. 57; Dr. Lin Test., Feb. 4.)  The next month, though, it agreed to unfreeze the account so that EverNu could make payroll.[13]  (Def.'s Ex. 61; James Vouros Test., Mar. 4.)

81.   Over the next two years, Dr. Lin and EverNu continued to earn and accumulate sanctions. (Def.'s Exs. 1.38, 1.39, 1.42, 1.43.)  Neither paid any of them.  (Dr. Lin Test., Feb. 4.)

###   K.   Rohm and Haas receives concerning discovery from Temple University

82.   Meanwhile, from 2006 to 2007, besides pursuing sanctions against Dr. Lin and EverNu, Rohm and Haas had sought and obtained discovery from Temple University.  With this endeavor, Rohm and Haas secured its first real glimpse of EverNu's DOE-funded MAA work, a glimpse that elevated Vouros's concern that Dr. Lin was using their confidential information.

83.   Back on January 10, 2002, without telling Rohm and Haas, Dr. Lin had applied to the DOE on behalf of EverNu for the Phase I grant to fund her project on converting isobutane to MAA in one step, listing Temple University as the research institution.  (Pl.'s Ex. 117.)[14]  In this application, she requested $99,998 for EverNu and explained in broad strokes its plan to research and develop an MMO catalyst to convert isobutane to MAA in one step.  (*Id.*)

84.   About nine months later, EverNu was awarded the Phase I grant by the DOE.  (Dr. Lin Test., Jan. 30.)  In exchange for 20% of this grant, Temple agreed to provide Dr. Lin and EverNu with research facilities and to allow Dr. Strongin, a chemistry professor at the university, and

---

[13] On November 29, 2006, Dr. Lin moved to have these judgments vacated.  (Def.'s Exs. 62.4, 62.5.)  On June 4, 2007, Judge Moore vacated the June 30, 2006, judgments.  (Def.'s Ex. 62.7.)  He ordered the judgments struck on procedural grounds having nothing to do with the merits.  The sanctions were never stricken.

[14] This is the grant proposal that accompanied the abstract that Vouros later discovered in March 2003, triggering the April and August 2003 MAA-related discovery.  As will be discussed, though, Vouros did not see this full grant proposal until 2006 when Temple produced it to Rohm and Haas.  Until then, the abstract was the only document that he and others associated with Rohm and Haas had seen.  (James Vouros Test., Jan. 28; Dr. Han Test., Mar. 4.)

his team to work with them on the MAA project.  (*Id.*)  Dr. Lin and Dr. Strongin divided the labor: Dr. Lin designed and prepared the catalysts; Dr. Strongin's team tested the catalysts; and Dr. Lin recorded the results.  (*Id.*)

85.   On April 22, 2003, EverNu then applied to the DOE for a Phase II grant.  (Pl.'s Ex. 9.) Seeking $749,996 this time, Dr. Lin described how EverNu had developed some MMO catalysts "with excellent potential for further optimization in Phase II."  (*Id.*)  For Phase II, she reported that she planned to use computers to further optimize the catalyst compositions, preparation methods, and process conditions; to analyze the structure-performance relationship of the catalysts; to file patent applications; and to seek industrial partners for Phase III.  (*Id.*)

86.   Several months later, EverNu was awarded the Phase II grant by the DOE.  (Dr. Lin Test., Jan. 30.)  With this grant money, it hired an employee with a PhD.  (*Id.*)  It also once again gave 20% of the money to Temple in exchange for the university's resources.  (*Id.*)

87.   On October 23, 2003, in preparation for Phase II, Dr. Lin wrote a memo to Dr. Strongin and others on the team summarizing Phase I and outlining the goals and steps for Phase II. (Def.'s Ex. 10.5.)  In this memo, Dr. Lin, among other things, reported in a chart the results of their testing of various catalysts, though the listed compositions were coded.  (*Id.*)  She also displayed the structure-performance analysis of one catalyst with which she had worked. (*Id.*)

88.   In 2004, in the middle of the Phase II research, Dr. Lin decamped from Temple.  (Dr. Lin Test., Feb. 4.)  She moved to a lab at Villanova, hauling most of her research with her, including lab notebooks and data sets.  (*Id.*)

89. In early 2006, though, Rohm and Haas knew almost nothing about this DOE-funded MAA
    work that Dr. Lin and EverNu had done from 2002 to 2004 with Dr. Strongin at Temple.
    Indeed, at that time, it was still pursuing sanctions against her and EverNu because they had
    refused to provide it with any discovery, as ordered by the Montgomery County court, that
    would have revealed this information.  As of then, it possessed only EverNu's Phase I grant
    abstract that its outside lawyer had discovered on the Internet in 2003.  (James Vouros Test.,
    Jan. 28; Dr. Han Test., Mar. 4.)

90. At that time, Rohm and Haas thus sought discovery from Temple on Dr. Lin and EverNu's
    MAA work there.  It requested that Temple produce Dr. Strongin for a deposition and also all
    documents related to his and Dr. Lin's work on the MAA project.  (James Vouros Test., Mar.
    4.)  Dr. Lin objected to this discovery, but, on June 12, 2006, Judge Moore denied her
    objections.  (Def.'s Ex. 1.29.)  And several months later, Temple itself filed a motion for a
    protective order, which Judge Moore denied on December 4, 2006, ordering it to produce Dr.
    Strongin for a deposition and all relevant documents.  (Def.'s Ex. 1.32.)

91. Over two productions in January and February 2007, Temple gave Rohm and Haas all
    documents it had that related to Phases I and II of EverNu's MAA project.  (James Vouros
    Test., Mar. 4.)  It produced an incomplete copy of the project's data, which it had obtained
    from a research assistant who happened to back up some of the data from Phases I and II that
    he had recorded for Dr. Lin.  (Def.'s Ex. 3.)  It also produced a copy of EverNu's Phase I
    grant proposal to the DOE and a copy of Dr. Lin's October 23, 2003, memo to Dr. Strongin
    and others.  (Def.'s Exs. 10.1, 10.4; James Vouros Test., Mar. 4.)  This document production
    was necessarily limited, as Dr. Lin had taken almost everything with her when she left

Temple.  (James Vouros Test., Mar. 4.)  Still, it was the first time that Rohm and Haas had seen any documentation of Dr. Lin's MAA work with Dr. Strongin at Temple.  (*Id.*)

92.  Vouros then solicited Dr. Han's opinion on whether these documents revealed that Dr. Lin was using Rohm and Haas's confidential information or trade secrets.  (Dr. Han Test., Mar. 4.)  Until then, Dr. Han, of course, had seen only the abstract to the Phase I grant proposal. (*Id.*)  But after Vouros showed him the full Phase I grant proposal, he had additional concerns—namely that Dr. Lin had proposed partially substituting molybdenum for tungsten in an MMO catalyst and had described the potential benefits of such a substitution.  (*Id.*) This was a research concept that she was exposed to in her last year at Rohm and Haas.  (*Id.*) Dr. Han was also unsettled by her memo to Dr. Strongin: it revealed only a small sampling of data, suggesting that she still exclusively possessed much more Phase I information in the form of computer and data files.  (*Id.*)  He voiced these concerns to Vouros.  (*Id.*)

93.  Vouros also solicited Dr. Cavalcanti's opinion.  (Def.'s Ex. 27.)  After analyzing Dr. Lin's memo to Dr. Strongin, he concluded that Dr. Lin's research generally overlapped with the research he had done while she was still at Rohm and Haas.  He felt that her research focused on the same area in which he had worked: MMOs as catalysts for converting isobutane to MAA.  (Dr. Cavalcanti Test., Jan. 29.)  He could not, however, identity any specific overlaps or say definitively that she had used Rohm and Haas's confidential information in her research.  (*Id.*)  That was because, in her memo to Dr. Strongin, she had disclosed the testing results of only a small sampling of catalysts, which were coded and their compositions thus masked.  (*Id.*)  He needed more information to analyze whether her research implicated Rohm and Haas's confidential information.  (*Id.*)  He conveyed these thoughts to Vouros. (*Id.*)

**L.      Rohm and Haas deposes Dr. Strongin, heightening Vouros's concern**

94.   On February 21 and March 2, 2007, Shaw deposed Dr. Strongin at Temple.  At the

deposition, Dr. Strongin and Temple were represented by a lawyer from the university.

(Def.'s Ex. 3.)  Dr. Lin was there with Hutchison and Chesney.  (*Id.*; James Vouros Test.,

Mar. 4.)  Vouros also attended and brought Dr. Han as a technical consultant.  (Dr. Han Test.,

Mar. 4.)  After this deposition, Vouros grew even more concerned that Dr. Lin was using

Rohm and Haas's confidential information in her MAA work with EverNu.

95.   At the deposition, Rohm and Haas showed Dr. Strongin two confidential research documents

related to Dr. Cavalcanti's MAA research at Rohm and Haas.  (Def.'s Ex. 3.)  One document

came from the May 1999 monthly report and showed the results of Dr. Cavalcanti's testing

of certain MMO, POM, and POM-like catalysts.  (Def.'s Exs. 3, 3.5, 17.)  The other came

from the fourth quarter 1999 report and showed the results of Dr. Lin's testing of the

tungsten-modified MMO-1 catalyst in her AA work.  (Def.'s Exs. 3, 3.8.)[15]

96.   After reviewing these documents, Dr. Strongin testified that the "chemistry" he gleaned from

them looked "very similar" to his work with Dr. Lin.  (Def.'s Ex. 3.)[16]  Later in the

deposition, he also testified that the chemistry in these documents "appear[s] to be chemistry

. . . that we investigated in our lab at Temple" and that "[t]he metal oxide composition seems

very similar to what we used."  (*Id.*)

97.   Vouros was concerned by this testimony.  He felt that Dr. Strongin had confirmed his

suspicion that Dr. Lin was using Rohm and Haas's confidential information in EverNu's

---

[15] As discussed earlier, Rohm and Haas distributed this report on February 20, 2000, a few months after Dr. Lin had left Rohm and Haas.  Nevertheless, Dr. Lin wrote the summary of her research that was included in this report.

[16] At trial, Dr. Lin objected on hearsay grounds to Rohm and Haas's use of Dr. Strongin's deposition statements. Rohm and Haas, however, introduced these statements not for their truth but for their effect on the listener, Vouros.

DOE-funded MAA project.  (James Vouros Test., Mar. 4.)  During and after the deposition,

Vouros spoke with Dr. Han, who echoed his concerns.  (Dr. Han Test., Mar. 4.)

**M.      Rohm and Haas extends a settlement offer at Dr. Strongin's deposition**

98.  On March 2, 2007, the second day of Dr. Strongin's deposition, Vouros and Shaw made a

fruitless attempt to end the case, extending a settlement offer to Dr. Lin.

99.  At a break in the deposition, Vouros and Shaw called Hutchison and Chesney out to the

hallway.  (John Chesney Test., Feb. 5, 2015; Hugh Hutchison Test., Mar. 2.)  They told them

that Rohm and Haas would drop its case in Montgomery County against Dr. Lin and waive

all the sanctions if she agreed to two terms.  (James Vouros Test., Jan. 26, Mar. 6.)

100.  First, they told them that EverNu must grant Rohm and Haas a royalty-free, nonexclusive

patent license to any MAA technology that it patents in the future.  (James Vouros Test.,

Mar. 6.)  That meant that EverNu could continue to work on its MAA technology, but if it

obtained any patents for this technology, then Rohm and Haas could use those patents

without paying a licensing fee.  (*Id.*)  EverNu, however, could still license the patents to other

companies for a fee.  (*Id.*)  Vouros testified that he felt that this arrangement would benefit

all parties: Dr. Lin could continue to pursue her MAA work via EverNu while Rohm and

Haas would maintain an interest in any MAA technology that Dr. Lin may develop using its

confidential information.  (*Id.*)

101.  Second, they told them that Dr. Lin must release all claims against Rohm and Haas.  Under

this term, Dr. Lin would grant Rohm and Haas a "general release" from all claims, current

and future.  (*Id.*)  At trial, Vouros testified that this general release would have included any

current or future EEOC charges, but that he was not thinking about these charges when he

included this term as part of the settlement offer.  (James Vouros Test., Jan. 28.)

102. According to Hutchison and Chesney, Vouros threatened to disrupt EverNu's relationship with the DOE if Dr. Lin declined this offer.  (Hugh Hutchison Test., Mar. 2; John Chesney Test., Feb. 5.)  Vouros, however, denied making this threat. (James Vouros Test., Mar. 6.)[17]

### N.   Rohm and Haas seeks to dismiss Dr. Lin's fourth EEOC charge

103. Meanwhile, from 2004 to 2007, as Rohm and Haas (via Vouros and Shaw) was pursuing sanctions against Dr. Lin and EverNu in Montgomery County and extending the settlement offer, the company (via Kresge) was also battling Dr. Lin over her fourth EEOC charge.

104. As discussed earlier, in May or June 2004, just after *Lin I* had ended, Dr. Lin filed her fourth EEOC charge against Rohm and Haas, which is the charge underlying this case.  *Lin I* had encompassed her second and third charges, so they were resolved with Judge Joyner's granting of summary judgment to Rohm and Haas in that case.  With this fourth charge, her only remaining charge, she alleged that Rohm and Haas was retaliating for her earlier EEOC charges by serving the 2003 MAA-related discovery requests on her and EverNu in the Montgomery County case.

105. The Rohm and Haas law department has always been divided into different units including the IP unit and the litigation unit.  The litigation unit encompassed the employment law department, which handled EEOC charges.  The EEOC sent Lin's 2004 charge to Rohm and Haas's employment law group head Kara Gordon on September 20, 2004.  Vouros was an IP attorney, in the IP unit and never worked in the litigation unit.  (Def.'s Ex. 9.5; James Vouros Test., Mar. 6.)

106. Rohm and Haas, represented by Kresge (its lawyer in *Lin I* and in this case), fought this charge.  (Pl.'s Ex. 201.)  On October 18, 2004, Kresge wrote a letter to the EEOC in which

---

[17] Dr. Lin argues that Vouros testified falsely.  As I will explain in Part R.2.i, even if he did testify falsely about this threat, it is not compelling enough evidence to show that he extended this offer because of her EEOC charges.

he argued that the dispositive issue in the charge had already been decided against Dr. Lin in *Lin I*. (Pl.'s Ex. 201.) On December 14, 2004, the EEOC dismissed the charge for lack of jurisdiction. (Def.'s Ex. 9.6.)

107. Rohm and Haas's victory, though, did not stick. Dr. Lin contested the EEOC's dismissal, and on March 15, 2005, the EEOC agreed to reconsider its jurisdiction over the charge. (Pl.'s Ex. 202.) Two weeks later, on March 30, 2005, Kresge wrote another letter to the EEOC urging it not to reconsider its jurisdiction. (*Id.*) About two years later, though, on April 5, 2007, the EEOC concluded that it did in fact have jurisdiction over Dr. Lin's charge. (Def.'s Ex. 9.7.)[18]

108. Vouros testified that he was not involved in fighting this charge and remembered first learning of it in "the spring of 2007"—which was after he had pursued the sanctions against Dr. Lin and EverNu in Montgomery County and after he had extended the allegedly threatening settlement offer. (James Vouros Test., Jan. 28.) According to Vouros, at that time, he was walking on Market Street in Philadelphia and ran into Kresge, who told him that Dr. Lin had filed this charge in 2004 and that the EEOC had just decided on April 5, 2007, that it had jurisdiction over it. (James Vouros Test., Jan. 28, Mar. 6.)

109. Dr. Lin, however, established at trial that Vouros first knew of this charge in April 2005 at the latest. On April 4, 2005, Vouros wrote a privileged email to Shaw that is described in the privilege log as including a "separate, short reference to request for reconsideration before the EEOC." (Pl.'s Ex. 200.) When confronted with this April 2005 email, Vouros conceded that he must have written it and that he must have then known of the 2004 charge. (James Vouros Test., Jan. 28, Mar. 6.) But he also testified that he did not remember sending that

---

[18] On March 8, 2011, the EEOC issued Dr. Lin her right-to-sue letter.

email and maintained that he first remembered learning of the charge in the spring of 2007.

(*Id.*)[19]

### O.    Vouros communicates with the DOE about Dr. Lin and EverNu

110.  In December 2007, about ten months after Vouros had extended the allegedly threatening
settlement offer, he contacted the DOE about Dr. Lin and EverNu.  From then until August
2008, he communicated with the DOE numerous times. These communications evolved from
his requesting the return of Rohm and Haas's confidential documents that Dr. Lin had sent to
the DOE, to his informing the DOE of a recent default judgment against Dr. Lin in
Montgomery County, to his inquiring whether the DOE was still funding Dr. Lin and
EverNu.

111.  Back on June 2, 2005, Judge Moore had issued the order allowing Rohm and Haas to submit
to the DOE all documents pertinent to a DOE investigation, regardless of whether they were
designated as confidential under the confidentiality stipulation.  (Def.'s Ex. 1.22.)  Later that
month, Dr. Lin decided that she wanted this privilege for EverNu, and so EverNu filed a
motion to clarify the June 2 order, seeking permission to also be allowed to submit
documents to the DOE.  (Def.'s Ex. 1.23.)  A few weeks later, on June 22, 2005, Judge
Moore denied EverNu's motion.  (Def.'s Ex. 1.24.)

112.  On September 1, 2005, Rohm and Haas produced to Dr. Lin forty-five pages of documents
on Dr. Cavalcanti's 1999 MAA research.  (Pl.'s Ex. 13.)  It submitted them in response to her
discovery request for documents that she was exposed to at Rohm and Haas that contained
trade secrets.  (Pl.'s Exs. 218, 219.)  These forty-five pages consisted of 1999 monthly

---

[19] Dr. Lin argues that Vouros testified falsely when he said that he remembered first learning about her 2004 charge
in the spring of 2007.  She contends that he did so to create the misimpression that he did not take his actions from
2004 to 2007 because of this charge.  As I will discuss further in Part R.2.a, I find that it is more likely than not that
Vouros testified truthfully when he said that he first remembered learning of the 2004 charge in the spring of 2007,
and even if he did not, Dr. Lin has still failed to show that he took these actions because of her EEOC charges.

reports for May, June, July, and October, as well as 1999 quarterly reports for the first, second, and third quarters.  (Def.'s Ex. 17; Dr. Lin Test., Feb. 4.)  They were covered under the parties' confidentiality stipulation, so Dr. Lin could not give them to any outside party without Rohm and Haas's prior consent.  (Def.'s Ex. 1.2; Dr. Lin Test., Feb. 4.)

113.   Nevertheless, about three weeks later, Dr. Lin, on EverNu's behalf, sent the forty-five pages of confidential documents to the DOE.  (Def.'s Ex. 15.1.)  In a letter to David Hill, then-Deputy General Counsel for Energy Policy at the DOE, and Lawrence Oliver, then-Assistant General Counsel for Energy Efficiency at the DOE, she attached the forty-five pages and asked them to compare these pages to her DOE proposals and decide if there was any overlap.  (*Id.*)  She did not ask Rohm and Haas and Judge Moore for permission to send the DOE these documents.  (Dr. Lin Test., Feb. 4.)  Nor did she tell them once she had done so. (*Id.*)

114.   Nearly two years later, Vouros learned for the first time that Dr. Lin had sent these documents to the DOE.  (James Vouros Test., Mar. 4.)  On November 13, 2007, the Philadelphia Inquirer ran a story titled "New Twist in Rohm & Haas Case" that centered on an internal DOE memorandum written by Charles Russomanno, the DOE employee who had awarded EverNu its MAA grant.  (Pl.'s Ex. 211.)  In the memo, Russomanno compared EverNu's DOE-funded MAA project to Rohm and Haas's forty-five pages and concluded that EverNu's project did not implicate any Rohm and Haas trade secrets.  (*Id.*)  To Vouros's surprise, the article revealed that "in September 2005, Lin mailed to the Energy Department in Washington the confidential 45 pages that Rohm and Haas submitted to the court. She told neither Moore nor Rohm and Haas."  (*Id.*)

115. Just over a month later, Vouros contacted the DOE for the first time.  (James Vouros Test.,

Mar. 6.)  On December 26, 2007, he sent a letter to Hill and attached the Philadelphia

Inquirer article.  (Def.'s Ex. 14.1.)  In his letter, he told Hill about Dr. Lin's unauthorized

disclosure of Rohm and Haas's confidential documents and requested that the DOE return

them.  (*Id.*)

116. The DOE soon returned them.  On February 8, 2008, Paul Gottlieb, then-Assistant General

Counsel for Technology Transfer and Intellectual Property, sent them back to Vouros, telling

him that they were "submitted to DOE as an enclosure to an unsolicited letter from Dr. Lin."

(Def.'s Ex. 14.3.)  All was then quiet for a little while between Vouros and the DOE.

117. About four months later, in mid-May 2008, Vouros contacted the DOE again, though this

time for different reasons.  As will be discussed further in Part I.Q, earlier that month, Rohm

and Haas had obtained a default judgment against Dr. Lin in the Montgomery County case

for her continued willful defiance of Judge Moore's orders.  As part of the relief for this

judgment, Judge Moore had permanently enjoined Dr. Lin from working on MAA generally

and on the DOE-funded MAA project specifically.  So on May 13, 2008, Vouros wrote a

letter to Hill informing him of these portions of the injunction and attaching the order.

(Def.'s Ex. 14.4.)  He also requested that the DOE disclose to Rohm and Haas whether Dr.

Lin had helped Russomanno prepare his memo; how the memo was leaked to the

Philadelphia Inquirer; what actions the DOE planned to take against Dr. Lin, EverNu, and

Russomanno; and what the DOE planned to do with the information generated by EverNu's

DOE-funded MAA project.  (*Id.*)

118. Over the next three months, Vouros pursued the DOE for a formal response.  On June 3,

2008, he emailed Hill asking when he could expect an answer to his May letter.  (Pl.'s Ex.

114.)  Two days later, Vouros heard from Stephen Skubel, Assistant General Counsel for

Litigation at the DOE, who told him that the DOE was reviewing the issue and would soon

respond.  (Def.'s Ex. 14.5.)  Later that month, Vouros asked Skubel about the investigation's

status, only to hear from him a week later that it was still ongoing.  (*Id.*)  In early July, he

emailed Skubel, concerned because Rohm and Haas had just learned that EverNu had applied

for a patent on a catalyst that converts isobutane to MAA.  (*Id.*)  Hearing nothing, he then

emailed Skubel on July 17; this time, though, he also told Skubel that he wanted to discuss

the monetary judgments that Rohm and Haas had against Dr. Lin and EverNu.  (*Id.*)  Skubel

responded the next day, telling Vouros that the investigation was still ongoing.  (*Id.*)

Unsatisfied, Vouros emailed Skubel back that day and asked him if the DOE had "stopped all

funding" to Dr. Lin and EverNu, stopped "all interaction"  with them on the MAA project,

and stopped paying them "all money under any DOE funded project."  (Pl.'s Ex. 102.)  He

also asked Skubel whether the DOE owed EverNu any grant payments, and if so, how "best

to serve the DOE to collect on our judgments."  (*Id.*)  Vouros then emailed Skubel on August

11, reiterating the questions from his previous email.  (*Id.*)

119.   About a month later, on September 8, 2008, Skubel sent Vouros a formal response to his

May 13, 2008, letter.  (Def.'s Ex. 14.6.)  On the status of EverNu's DOE-funded MAA

project, he told Vouros that the DOE had made "only one award to EverNu involving

[MAA]" and that "DOE records show that all research pursuant to that DOE grant was

completed by June 26, 2006."  (*Id.*)  He also told Vouros that the DOE did not plan to award

EverNu additional funds for this project.  (*Id.*)

120.   That was the first time that Vouros learned that Dr. Lin had ended EverNu's DOE-funded

MAA research over two years earlier.  (James Vouros Test., Jan. 28, Mar. 6.)  She had never

informed Rohm and Haas or Judge Moore that it had ended.  (James Vouros Test., Mar. 6.)
After learning this news, Vouros did not communicate with the DOE again about Dr. Lin or
EverNu.  (Id.)[20]

      **P.**      **Dr. Lin is granted a patent that is of little concern to Rohm and Haas**

121.  Although Dr. Lin had finished her DOE-funded MAA research in 2006, she did not intend to
walk away empty handed.  In July 2008, Vouros learned that she had applied for a patent for
an invention that he and others believed encompassed Rohm and Haas's technology.  Rather
than fighting her application, though, he let it proceed uninterrupted, culminating in an
amended patent granted to her that he felt posed little threat to Rohm and Haas.

122.  On July 24, 2008, the United States Patent and Trademark Office (USPTO) published a
patent application—titled "Selective Oxidation of Alkanes and/or Alkenes to Valuable
Oxygenates"—that listed Dr. Lin as the inventor.  (Def.'s Ex. 13.1.)  With this application,
she sought to patent (1) a catalyst composition, (2) its method of preparation, and (3) its use
for producing MAA.  (Id.)  To that end, she described thirty claims in her application that
implicated these three areas.  (Id.)[21]  Of these claims, some were "independent," meaning
they described the invention's scope as broadly as allowed under the statute.   (Todd
Dickinson Test., Mar. 3, 2015.)  Others were "dependent," meaning they derived from the
independent claims but usually were narrower in scope or provided alternatives to elements
of the independent claims.  (Id.)

---

[20] In her testimony, Dr. Lin agreed that there was no damage to her or EverNu as a result of the Vouros communications to the DOE.

[21] In a patent application, the claims define the boundaries of the invention.  (Patrick Hagan Test., Feb. 5.)

123. Dr. Lin's catalyst composition contained three essential elements and could contain two additional, optional elements.[22]  (Def.'s Ex. 13.1; Patrick Hagan Test., Feb. 5.)  A, B, and X represented essential elements and listed many possibilities, including niobium.  (Def.'s Ex. 13.1).  Y and Z represented optional elements and, if present, listed many possibilities, including vanadium.  (*Id.*)

124. Shortly after Dr. Lin's application was published, Vouros solicited comments on it from Dr. Han and Dr. Cavalcanti.  (James Vouros Test., Mar. 6.)  Concerned, they told him that the broad scope of the claims encompassed Rohm and Haas's patents in AA and MAA, including ones listing Dr. Cavalcanti as an inventor.  (*Id.*; Dr. Cavalcanti Test., Jan. 29.)

125. Vouros shared their concern. (James Vouros Test., Jan. 28.)  After comparing Dr. Lin's application to Rohm and Haas's patents and patent applications in this area, he, too, was worried about the application because its claims encompassed some of these patents.  (James Vouros Test., Jan. 28, Mar. 6.)  Nevertheless, he concluded that her application would not be granted and let it proceed uninterrupted through the review process.  (*Id.*)[23]

126. Even if he had wanted to insert Rohm and Haas into Dr. Lin's patent application process, there was little he could have done.  (James Vouros Test., Mar. 6.)  If Rohm and Haas had provoked a patent interference action, it would have had to file a competing patent application with almost identical claims, based on a good faith belief that the claims were patentable.  (Todd Dickinson Test., Mar. 3.)  For a claim to be patentable, it must be novel (among other things), meaning it cannot have already been invented.  (*Id.*)  Given Rohm and

---

[22] As stated earlier, if an element is essential, it is required for the catalyst to operate; if an element is optional, it is not essential for the catalyst to operate and can be absent. See *supra* note 3.

[23] Vouros holds not only a law degree but also bachelor's and master's degrees in chemistry.  (James Vouros Test., Mar. 4.)  In fact, while he was in law school from 1988 to 1991, he worked at Rohm and Haas as a patent agent.  (*Id.*)  He is also admitted to the bar of the USPTO and has worked since 1991 as an intellectual property lawyer at Rohm and Haas (now The Dow Chemical Company).  (*Id.*)

Haas's own existing patents and patent applications, Vouros did not believe that EverNu's patent application contained patentable claims, and so he did not believe that he could in good faith direct the filing of a competing application. (James Vouros Test., Jan. 26, Mar. 6.)[24] Indeed, Todd Dickinson, former Undersecretary of Commerce for Intellectual Property and Director of the USPTO, credibly testified that an interference action by Rohm and Haas in this context would have been asserted in bad faith. (Todd Dickinson Test., Mar. 3.)

127. On July 6, 2010, the USPTO examiner did in fact reject almost all of Dr. Lin's claims that he had reviewed. (Def.'s Ex. 13.2.) Of the three areas that Dr. Lin sought to patent—catalyst composition, its method of preparation, and its use for producing MAA—she had elected for the examiner to analyze her claims relating only to the first two areas (which were claims 13-30). (Patrick Hagan Test., Feb. 5.)[25] So the examiner initially withdrew claims 1-12 from consideration. (Id.) He then rejected claims 13-30 except for claim 15 (to which he objected), finding them "clearly anticipated" (i.e., not novel) by four Rohm and Haas patents and one patent application. (Def.'s Ex. 13.2.)

128. The next month, Dr. Lin amended all thirty claims in her application. (Def.'s Ex. 13.3.) Among other things, she changed the scope of all of the independent claims in her original patent application by removing vanadium as an optional element and niobium as an essential element. (Id.; Patrick Hagan Test., Feb. 5.) Vanadium and niobium were elements in the catalyst compositions in each of the Rohm and Haas patents and the patent application cited by the examiner. (Dr. Cavalcanti Test., Jan. 29; Patrick Hagan Test., Feb.5; Todd Dickinson Test., Mar. 3; Def.'s Ex. 13.2). This change necessarily also altered the scope of the

_____

[24] Besides a patent interference action, Rohm and Haas could have submitted citations of its patents to the USPTO in regard to Dr. Lin's patent application. But it could not have submitted any accompanying explanation or argument, and so Vouros decided to reserve those citations for possible future litigation. (Id.)

[25] She opted to have the claims related to the third area reviewed at a later time if necessary. (Id.)

dependent claims.  (Patrick Hagan Test., Feb. 5.)  Based on these amendments (and some

others), the examiner allowed all of her claims.  (Def.'s Ex. 13.4.)

129.   On February 15, 2011, the USPTO granted Dr. Lin's amended patent application.  (Def.'s

Ex. 13.5.)

130.   Given Dr. Lin's amendments, Vouros was less concerned about her patent.  He felt that she

had changed the scope of her claims such that they no longer threatened to implicate Rohm

and Haas's technology, processes, or catalysts.  (James Vouros Test., Jan. 28.)  He also

believed that the amendments removed Rohm and Haas as a target for a patent infringement

suit by Dr. Lin.  (James Vouros Test., Mar. 6.)  And, in any event, he thought that her patent

did not work very well.  (*Id.*)

**Q.     Rohm and Haas wins a default judgment against Dr. Lin**

131.   Meanwhile, back in December 2007, as Vouros was first contacting the DOE, he had also

started the process that brought the Montgomery County case to its current, stagnant

condition.

132.   At that time, Rohm and Haas moved for a default judgment against Dr. Lin for her willful

noncompliance with discovery.  (Pl.'s Ex. 70.)  As relief for this judgment, Rohm and Haas

proposed that Judge Moore enjoin Dr. Lin from, among other things, (1) asserting claims or

defenses in any forum that Rohm and Haas was infringing on AA or MAA intellectual

property that she possessed; (2) using or disclosing any information that Rohm and Haas

considered a trade secret; and (3) pursuing her DOE-funded MAA research.  (Pl.'s Exs. 70,

77.)  It also proposed that Judge Moore order Dr. Lin, over the next three years, to submit to

Rohm and Haas for a ninety-day trade-secret review any presentation, publication, or

proposal.  (Pl.'s Ex. 77.)

133. About five months later, on May 2, 2008, Judge Moore granted Rohm and Haas's motion. (Def.'s Ex. 1.44.)  As a remedy, he awarded it the following injunctive relief, set out in four paragraphs: (1) Dr. Lin is permanently enjoined from using or disclosing directly or indirectly any information that Rohm and Haas considers confidential or a trade secret; (2) Dr. Lin and any other entity or individual associated with her or acting on her behalf are permanently enjoined from researching MAA; (3) Dr. Lin is permanently enjoined from working on the DOE-funded MAA project; and (4) Dr. Lin, over the next three years, must submit to Rohm and Haas for a ninety-day trade-secret review any presentation, publication, or proposal.  (*Id.*)

134. That day, at Rohm and Haas's request, the Montgomery County court entered money judgments against both Dr. Lin and EverNu.  (Pl.'s Ex. 186.)  In July and August 2008, Rohm and Haas then served writs of execution on Dr. Lin's and EverNu's bank accounts, causing Dr. Lin to post cash and a supersedeas bond to unfreeze those accounts.  (*Id.*)  In November 2008, the Montgomery County court struck these judgments.  (*Id.*)

135. In his opinion in support of his May 2, 2008, order, Judge Moore held that Rohm and Haas deserved a default judgment in its favor since Dr. Lin had refused to produce the discovery. (Def.'s Ex. 1.45.)  He found Rohm and Haas's need for this discovery from EverNu to be "extraordinary compelling," as it required this information to enforce its preliminary injunction against Dr. Lin and to pursue its underlying equity claims.  (*Id.*)  Given this discovery's relevance and Dr. Lin's refusal to provide it, he concluded that Rohm and Haas was "severely prejudiced by [Dr. Lin's] intransigence."  (*Id.*)

136. He also explained the injunctive relief that he had awarded to Rohm and Haas.  He asserted that paragraphs 1 and 4 of the order simply finalized the same types of general provisions set

out in the 2001 preliminary injunction.  (*Id.*)  As for paragraphs 2 and 3—the provisions

barring Dr. Lin from working with MAA—he explained that they were proper because the

MAA information was critical discovery that Dr. Lin had refused to produce.  (*Id.*)

137.   On appeal, the Superior Court affirmed the default judgment.  (Def.'s Ex. 1.47.)  It agreed

with Judge Moore that the discovery was relevant, stating that "the requested discovery was

related to Rohm and Haas' underlying equity action and to enforcement of the preliminary

injunction."  (*Id.*)  Like Judge Moore, it also found that Rohm and Haas was prejudiced by

Dr. Lin's "willful defiance of the court's discovery orders and disregard for the myriad less

severe sanctions."  (*Id.*)  It stated that Dr. Lin was the "driving force" behind the violation of

the discovery orders.

138.   The Superior Court, however, disagreed with two of the four paragraphs in Judge Moore's

injunction order.  It first affirmed paragraphs 1 and 4.  These paragraphs, according to the

court, resembled paragraphs 1 and 2 of the preliminary injunction, and so they were

appropriate because the default judgment made the preliminary injunction permanent.  (*Id.*)

But the court held that paragraphs 2 and 3—the ones related solely to Dr. Lin's future work

with MAA—were "overly broad and not supported by the record."  (*Id.*)  For that reason, the

court vacated these paragraphs and partially remanded the case to the trial court so that Rohm

and Haas could produce evidence in support of these paragraphs.  (*Id.*)

139.   Dr. Lin unsuccessfully appealed the Superior Court's decision.  She first pleaded her case to

the Pennsylvania Supreme Court, which declined to hear it on April 6, 2011.  (Def.'s Ex.

1.48.)  She next looked to the U.S. Supreme Court, which denied certiorari on December 12,

2011.  (Def.'s Ex. 1.49.)

140. Just over two and a half years later, on August 12, 2014, Rohm and Haas told Judge Moore
   by letter that it would not seek a remand hearing on the injunction's MAA paragraphs.
   (Def.'s Ex. 6.)  It informed him that paragraph 3 was moot because it now knew that EverNu
   had completed its MAA research in 2006.  (*Id.*)  As for paragraph 2, it stated that it had never
   requested this relief, and, in any event, it was adequately protected from Dr. Lin's using or
   disclosing its MAA trade secrets by paragraph 1 and by Dr. Lin's contractual confidentiality
   obligations.  (*Id.*)  It also stated that it had waited this long to decide on the remand hearing
   because from August 2010 to May 2014, Dr. Lin was pursuing an abuse-of-process case
   against it in another court and was arguing that any action it took in Montgomery County
   constituted a new violation that would satisfy the limitations period under a continuing
   violation theory.  (*Id.*)

141. For all of the actions about which Dr. Lin complained at trial, I find Vouros was motivated
   by a good faith belief that Dr. Lin may be using Rohm and Haas confidential information in
   the DOE MAA grant work.  He directed that discovery be served on Dr. Lin and then on
   EverNu to protect Rohm and Haas's intellectual property, to enforce the preliminary
   injunction order and to discover if Dr. Lin was using and/or disclosing Rohm and Haas
   confidential information.  She consistently refused to supply such discovery or to comply
   with the numerous court orders that she do so.

   **R.     Rohm and Haas did not pursue Dr. Lin because of her EEOC charges**

142. Dr. Lin alleges that Rohm and Haas via Vouros took many of the above actions against her
   between 2003 and 2008 because she had filed and pursued her EEOC charges against it.
   Based on the evidence, however, I find that Vouros took these actions because he had
   legitimate, non-retaliatory reasons for doing so.  Specifically, in 2003, Vouros approved

service of the MAA-related discovery requests on Dr. Lin and the subpoena on EverNu

because he reasonably believed that Dr. Lin was using Rohm and Haas's confidential

information and wanted to determine if that was true.  Vouros then further pursued Dr. Lin

and EverNu in the Montgomery County case because they had refused to comply with Judge

Moore's orders, and because he believed in good faith that his actions were necessary to

protect Rohm and Haas's confidential information.

### 1.      Rohm and Haas's initial requests for MAA-related discovery

143.   Dr. Lin contends that Vouros approved service of the April 2003 discovery requests on her;

the June 2003 motions to compel; and the August 2003 subpoena on EverNu, because she

had filed and pursued her EEOC charges.[26]  By contrast, Vouros testified that he approved

these actions because he was concerned that she was using Rohm and Haas's confidential

information and wanted to determine if that was true.  The evidence supports his testimony.

### a.      April 2003 interrogatories and document requests

144.   Vouros approved service of these discovery requests on Dr. Lin just three weeks after he had

received the abstract of the grant proposal that she submitted to the DOE in 2002 on

EverNu's behalf seeking funding for the MAA project.  These were the discovery requests

that focused on her communications with the DOE about this grant request and any others.

145.   At the time he approved of these discovery requests, Vouros knew that Dr. Lin had violated

her confidentiality obligations to Rohm and Haas in the past.  (James Vouros Test., Jan. 28,

Mar. 4, Mar. 6.)  In November 1999, Dr. Lin had left Rohm and Haas under her obligations

of confidentiality.  Indeed, as part of her settlement agreement, she had promised not to use

---

[26] As I will explain further in my conclusions of law, Dr. Lin cannot claim that Vouros took these actions against her because of her EEOC charges.  That is because I previously ruled that these actions were barred from the case based on res judicata, for they had been litigated in *Lin I*.  Nevertheless, I will still discuss how Rohm and Haas did not take these actions because of Dr. Lin's EEOC charges, as its legitimate reasons for taking these initial actions apply with equal force to most of the subsequent actions that Dr. Lin alleges that it took because of her EEOC charges.

or disclose any confidential information without Rohm and Haas's prior consent.  Although

Rohm and Haas agreed that she could present and publish articles based on her work there,

she first had to submit the material to Dr. Han for him to certify that it revealed no trade

secrets.  In the event of a dispute, she was to submit the material to Dr. Tatum for him to

review and decide if she could present it.  Yet in March 2000, she presented the company's

confidential information at the ACS conference in San Francisco even though Dr. Han and

Dr. Tatum had told her not to do so.  As a result, in June 2000, Rohm and Haas filed the

lawsuit against her in Montgomery County, accusing her of disclosing confidential

information in violation of her fiduciary and contractual duties.  In awarding Rohm and Haas

its preliminary injunction in April 2001, Judge Moore found that Dr. Lin had disclosed trade

secrets in her ACS presentation and taken confidential documents with her before leaving

Rohm and Haas.  Vouros was involved in this case, and so in April 2003, he knew of Judge

Moore's findings in issuing the preliminary injunction.

146. At the time he approved of these discovery requests, Vouros also reasonably believed that

Dr. Lin had violated the April 2001 preliminary injunction.  (James Vouros Test., Jan. 28,

Mar. 4.)  Judge Moore had enjoined Dr. Lin not only from using or disclosing Rohm and

Haas's confidential information but also from making or disclosing any scientific

presentation or publication without a ninety-day trade-secret-review by Rohm and Haas.  In

January 2002, Dr. Lin nevertheless submitted to the DOE the Phase I grant proposal for

EverNu's MAA project—without ever showing it to Rohm and Haas.  In March 2003, three

weeks before approving service of these discovery requests on Dr. Lin, Vouros first learned

of this proposal when its abstract was sent to him by the outside lawyer for Rohm and Haas.

147. Moreover, Vouros credibly testified that he had grown even more concerned after talking about the abstract with Dr. Han and Dr. Cavalcanti, two senior Rohm and Haas scientists. (James Vouros Test., Jan. 26, Mar. 4.)  They both told him that they were concerned by the project's title—"Metal Oxide Catalyst for Methacrylic Acid Preparation via One-Step Oxidation of Isobutane"—because it summarized a research area that Dr. Lin was exposed to at Rohm and Haas.  They also both told him that they were concerned by the catalyst described in the abstract because it resembled catalysts that Rohm and Haas had researched during Dr. Lin's last year at the company.  In addition, Dr. Cavalcanti told Vouros that he was concerned that Dr. Lin was proposing to study the structure-performance relationships of catalysts because he knew that she had been exposed to his own structure-performance studies in her last year at Rohm and Haas.

148. Vouros also credibly testified that he was concerned to see EverNu listed on the abstract as the entity that was to receive the DOE grant money.  (James Vouros Test., Jan. 28, Mar. 4.)  Back in August 2000, as part of Rohm and Haas's Montgomery County lawsuit against her, Dr. Lin had revealed to Rohm and Haas in her answers to their interrogatories that from "May – June 2000 [she] incorporated EverNu Technology."  (Def.'s Ex. 1.4.)  But she went on to state that in "June, 2000, EverNu Technology stopped all of its on-going business activities."  *Id.*  In March 2003, the time Vouros first saw Dr. Lin's grant abstract, she had not amended this interrogatory answer.

149. So when Vouros approved of this discovery in April 2003, three weeks after he had received the abstract to EverNu's 2002 grant proposal for its MAA project, he had ample reason to believe that Dr. Lin could be improperly using Rohm and Haas's confidential information. He knew that she had previously breached her confidentiality obligations to Rohm and Haas,

a breach that had resulted in the preliminary injunction that barred her (1) from using or disclosing the company's confidential information and (2) from making or disclosing any scientific presentation or publication without a trade-secret review.  He also reasonably believed that she had violated this preliminary injunction by submitting EverNu's grant proposal to the DOE without ever showing it to Rohm and Haas.  He then understandably grew even more concerned after Dr. Han and Dr. Cavalcanti—two senior Rohm and Haas scientists—told him that the abstract resembled research that she was exposed to at Rohm and Haas.  He was also understandably concerned after learning that EverNu was in fact an operating entity even though Dr. Lin had declared the opposite in her earlier, unamended interrogatory answer.

150. The evidence thus shows and I find that Vouros approved of this discovery not because Dr. Lin had filed and pursued her EEOC charges but because he believed that she could be using the company's confidential information and he wanted to determine if that was true.

### b.      June 2003 motions to compel

151. Vouros approved of these motions to compel after Dr. Lin in May 2003 had refused to comply with Rohm and Haas's April 2003 discovery requests.  In refusing to provide that discovery, she had argued that the information sought by Rohm and Haas belonged to EverNu, her single-member LLC, and not to her.  Given Dr. Lin's refusal to comply with the April 2003 discovery requests, Vouros credibly testified that he approved of these motions not because she had filed and pursued her EEOC charges but because he was still concerned that she was using Rohm and Haas's confidential information and wanted to determine if that was true.  (Vouros Test., Mar. 4.)  In early August 2003, Judge Moore granted these motions.

### c.      August 2003 subpoena

152. In late August 2003, Vouros approved service of the subpoena on EverNu.  This was the subpoena in which Rohm and Haas demanded that EverNu produce a corporate designee for a deposition, as well as all documents related to its business and to its technical activities.

153. At the time Vouros approved service of this subpoena on EverNu, he felt the same concerns that had prompted him to approve service of the April 2003 discovery requests on Dr. Lin. (Vouros Test., Mar. 4.)  That is because nothing had changed since Rohm and Haas had served those discovery requests on Dr. Lin: she had yet to produce any of the requested discovery to Rohm and Haas.

154. At this time, Vouros also had reason to believe that Rohm and Haas could obtain this discovery from EverNu.  (*Id.*)   Indeed, in May 2003, Dr. Lin had objected to the April 2003 discovery requests because she claimed that the information belonged not to her but to EverNu.  Although Judge Moore then rejected this argument in early August 2003 by granting Rohm and Haas's June 2003 motions to compel this information from Dr. Lin, she still had yet to produce anything when Vouros approved service of this subpoena on EverNu.

155. Vouros thus credibly testified that he approved of this subpoena on EverNu not because Dr. Lin had filed and pursued her EEOC charges but because he still believed that she could be using the company's confidential information and wanted to determine if that was true.  (*Id.*)

### 2.     Litigation Actions Between July 2004 and March 2007

156. Dr. Lin alleges that Vouros took the following actions against her between July 2004 and March 2007 because of her EEOC charges: July 2004 motion for attorney fees; September 2004, February 2005, and March 2005 motions for sanctions; September 2005 motion for partial summary judgment; February 2006 motion to aggregate fines and to award more fines and attorney fees; June 2006 entry of judgment on sanctions and July 2006 writs of execution

on EverNu's bank account; and March 2007 settlement offer.  By contrast, Vouros contends that he took these actions because Dr. Lin and EverNu had refused to comply with Judge Moore's orders, and because he believed in good faith that these actions were necessary to protect Rohm and Haas's confidential information.  The evidence supports his testimony.

### a.   Vouros's knowledge of Dr. Lin's 2004 EEOC charge[27]

157.   As support for her claim that Vouros took these actions because of her EEOC charges, Dr. Lin has argued that Vouros lied about when he first remembered learning of her fourth charge.  As discussed earlier, Dr. Lin filed this charge in May or June 2004.[28]  In December 2004, at Kresge's urging, the EEOC initially dismissed it for lack of jurisdiction.  At Dr. Lin's request, though, the EEOC in March 2005 agreed to reconsider its jurisdiction.  Kresge, in response, twice pressed the EEOC not to reconsider.  Nevertheless, in April 2007, the EEOC concluded that it did in fact have jurisdiction.  Vouros initially testified that he remembered first learning of this charge in the spring of 2007 when he ran into Kresge on Market Street in Philadelphia—which was after he had approved of several motions against Dr. Lin and EverNu in Montgomery County and after he had extended the settlement offer at Dr. Strongin's deposition.

158.   Yet when confronted with the privilege-log entry for his April 2005 email to Shaw—the entry that described his email as including a "separate, short reference to request for reconsideration before EEOC"—Vouros conceded that it showed that he must have known of the 2004 charge then, but he claimed that he did not recall sending that email and maintained that he remembered first learning of the charge from Kresge in the spring of 2007.  Relying on this testimony, Dr. Lin claims that Vouros testified falsely as to when he remembered first

---

[27] Again, this was Dr. Lin's fourth charge and is the one underlying this case.

[28] At the time, this was her only active EEOC charge.  Her second and third charges had been resolved in *Lin I*.

learning of this charge to create the misimpression that he did not retaliate against her from 2004 to 2007 for filing and pursuing it.  I find, however, that Vouros credibly testified in 2015 that he did not recall sending the April 2005 email and that he remembered first learning of this charge in the spring of 2007.

159. Dr. Lin has argued that Vouros actively monitored the progress of this EEOC charge and thus falsely testified about when he remembered first learning of it.  But besides the vague privilege-log entry that described his April 2005 email as including a "short reference to request for reconsideration before EEOC," Dr. Lin produced no direct evidence that Vouros, a lawyer in Rohm and Haas's Intellectual Property group, monitored this charge's progress.

160. Rather, the evidence establishes that from 2004 to 2007, this charge was monitored by Kara Gordon, head of Rohm and Haas's employment law group, and Kresge, the company's outside counsel for it.  In September 2004, Gordon was the Rohm and Haas lawyer whom the EEOC notified of this charge.  And Kresge thereafter communicated with the EEOC on Rohm and Haas's behalf until it concluded in April 2007 that it did in fact have jurisdiction. Vouros testified that, during this time, he spoke with neither Gordon nor Kresge about the charge—testimony that is supported by an entry in Rohm and Haas's privilege log.  That entry described a June 2007 email that Gordon had sent to Vouros in which she "[a]dvis[ed] [him] of Lin's current EEOC claim and R. Kresge response to it."  (Pl.'s Ex. 200.)

161. Moreover, at the time that Vouros testified at this trial, he was years removed from the events that Dr. Lin surmises show that he testified falsely about when he remembered first learning of this charge.  Specifically, he was almost ten years removed from the April 2005 email and about eight years removed from his spring 2007 encounter with Kresge on Market Street.  In light of his apparent lack of involvement in Dr. Lin's 2004 charge, the significant passage of

time since these events occurred supports his testimony that he does not recall sending the
April 2005 email and that he remembered first learning of this charge in the spring of 2007.

162. Even assuming that Vouros testified falsely about when he first remembered learning of this
charge, Dr. Lin has still failed to show that he acted as he did from 2004 to 2007 because of
her EEOC charges.  As will be discussed next, the evidence shows that he more likely than
not would have taken these actions regardless of whether Dr. Lin had filed these charges.

### b.    July 2004 motion for attorney fees

163. Rohm and Haas filed this motion for attorney fees after Dr. Lin had presented EverNu's
poster at the DOE-sponsored exhibition in New Orleans.  Leading up to that exhibition,
EverNu had filed its motion with Judge Moore to clarify whether the preliminary injunction
applied to it.   Dr. Lin wanted EverNu to be able to present at the exhibition without first
having to submit its poster to Rohm and Haas for a trade-secret review.  After both sides had
briefed and argued the issue, Judge Moore denied the motion.  Dr. Lin still presented the
poster, knowing full well that Judge Moore had denied it.  Vouros thus credibly testified that
he approved of this motion not because Dr. Lin had filed and pursued her EEOC charges but
because she had defied Judge Moore's order by presenting the poster in New Orleans.
(James Vouros Test., Mar. 4.)

### c.    September 2004 motions for sanctions

164. With these motions for sanctions, Rohm and Haas asked Judge Moore to order Dr. Lin and
EverNu to produce the discovery that it had requested back in 2003.  It also asked him to
levy a daily fine against them for their noncompliance and to order them to pay attorney fees.

165. When Vouros approved of these motions, Dr. Lin had still not complied with Rohm and
Haas's April 2003 discovery requests even though Judge Moore in June had granted its

motions to compel this discovery.  And EverNu, for its part, had not complied with Rohm

and Haas's August 2003 subpoena even though Judge Moore had denied its motion to quash

that subpoena and to grant it a protective order.  Vouros thus credibly testified that he

approved of these motions because Dr. Lin and EverNu had refused to comply with these

discovery requests and he wanted to compel them to produce this discovery that Rohm and

Haas needed to assess whether Dr. Lin was using its confidential information in EverNu's

MAA work.  (James Vouros Test., Mar. 4.)

166. On January 10, 2005, Judge Moore granted the motions, ordering Dr. Lin and EverNu to

produce the discovery and to pay attorney fees, though he declined to levy a daily fine for

noncompliance at that time.

### d.      February 2005 motion for sanctions

167. With this motion, Rohm and Haas again sought fines for each day that EverNu failed to

comply with its discovery requests.  When Vouros approved of this motion, EverNu had still

not produced any discovery despite Judge Moore's denial of its motion to quash the

subpoena and to grant it a protective order, and despite Judge Moore's January 2005 order in

which he granted Rohm and Haas's September 2004 motions for sanctions and ordered it to

produce the discovery.  Vouros thus credibly testified that he approved of this motion

because EverNu had refused to comply with Judge Moore's orders and he wanted to compel

it to produce this discovery that Rohm and Haas needed to assess whether Dr. Lin was using

its confidential information.  (James Vouros Test., Mar. 4.)

### e.      March 2005 motion for sanctions

168. With this motion for sanctions against Dr. Lin and EverNu, in addition to monetary

sanctions, Rohm and Haas sought an order bestowing on it EverNu's MAA intellectual

property.  It also asked Judge Moore to preclude Dr. Lin and EverNu from defending against

its claim that they were using its confidential information in EverNu's DOE-funded MAA

work.  Further, it asked to be able to submit to the DOE any documents relevant to an agency

investigation of the matter, regardless of whether they were subject to the parties'

confidentiality stipulation.

169.  When Vouros approved of this motion for sanctions, Dr. Lin and EverNu had still not

produced any discovery despite Judge Moore's orders.  Vouros thus credibly testified that he

approved of this motion for monetary and non-monetary sanctions because they had refused

to comply with Judge Moore's orders and he wanted to compel them to produce this

discovery that Rohm and Haas needed to assess whether Dr. Lin was using its confidential

information.  (James Vouros Test., Mar. 4.)

170.  In June 2005, Judge Moore awarded Rohm and Haas all of its requested relief, except for the

rights to EverNu's MAA intellectual property.

### f.      September 2005 motion for partial summary judgment

171.  With this motion, Rohm and Haas requested that Judge Moore assign to it any MAA

technology originating from EverNu's DOE grants, permanently enjoin Dr. Lin from

researching MAA, and enjoin her for five years from publishing anything without a trade-

secret review.

172.  When Vouros approved of this motion, Dr. Lin had still not produced any discovery despite

all of Judge Moore's orders.  As a result, Vouros credibly testified that he approved of this

motion because he believed even more strongly that Dr. Lin was using Rohm and Haas's

confidential information in EverNu's DOE-funded MAA project and he felt that any

technology originating from that project thus belonged to Rohm and Haas.  (James Vouros Test., Jan. 28.)

173.  In February 2006, Judge Moore denied this motion.

g.    **February 2006 motion to aggregate fines and to award additional fines and attorney fees**

174.  With this motion, Rohm and Haas asked Judge Moore to aggregate the fines and attorney fees that Dr. Lin and EverNu owed to it and to award it more fines and attorney fees.

175.  When Vouros approved of this motion, Dr. Lin and EverNu had still not produced any discovery despite all of Judge Moore's orders.  Nor had they paid any of the sanctions that Judge Moore had awarded to Rohm and Haas.  Vouros thus credibly testified that he approved of this motion because Dr. Lin and EverNu had refused to comply with Judge Moore's orders and he wanted to compel them to comply with these orders and to produce the discovery that Rohm and Haas needed to assess whether Dr. Lin was using its confidential information.  (James Vouros Test., Mar. 4.)

176.  In May 2006, Judge Moore granted the motion, ordering Dr. Lin to pay $32,000 within five days and entering judgment in favor of Rohm and Haas and against EverNu for $32,000.

h.    **June 2006 entry of judgment on sanctions and July 2006 writs of execution on EverNu's bank account**

177.  With these actions, Rohm and Haas reduced Judge Moore's May 2006 sanctions orders to judgments and served Dr. Lin with writs of execution against EverNu's bank account, causing the bank to temporarily freeze the account.

178.  When Vouros approved of these actions, Dr. Lin and EverNu had still not produced any discovery despite all of Judge Moore's orders.  Nor had they paid any sanctions that Judge Moore had ordered them to pay.  Vouros thus credibly testified that he approved of these

motions because Dr. Lin and EverNu had refused to comply with Judge Moore's orders and he wanted to compel them to comply with these orders and to produce the discovery that Rohm and Haas needed to assess whether Dr. Lin was using its confidential information. (James Vouros Test., Mar. 4.)

### i.        March 2007 settlement offer

179.   In March 2007, at Dr. Strongin's deposition, Vouros and Shaw extended the allegedly threatening settlement offer to Dr. Lin by conveying it to Hutchison and Chesney.  As discussed, they told them that Rohm and Haas would drop its case in Montgomery County against Dr. Lin and waive the sanctions if (1) EverNu granted it a royalty-free, nonexclusive patent license to its future MAA technology; and (2) Dr. Lin granted it a general release of claims.  Dr. Lin mostly draws on Vouros's testimony at trial about two different aspects of this settlement offer in arguing that he extended it because of her EEOC charges.

180.   She highlights how Vouros admitted in his testimony that the general release of claims would have included EEOC charges.  At trial, Vouros testified that this general release would have encompassed any current or future litigation, including EEOC charges.  He further testified, though, that he was not thinking of EEOC charges when he included this term.

181.   This testimony is not strong evidence that Vouros extended the settlement offer because of her EEOC charges.  Vouros testified only that the general release would have included EEOC charges, but that he was not thinking of them at the time.  Neither Hutchison nor Chesney testified that Vouros referenced EEOC charges in the settlement conversation.  In fact, later that month, Hutchison wrote a letter to an unidentified person in which he described the conversation in detail and never mentioned EEOC charges.  (Def.'s Ex. 59.)

182. Dr. Lin also relies on Vouros's testimony about whether he threatened to harm EverNu's relationship with the DOE if she rejected the offer.  Hutchison and Chesney testified that Vouros threatened to harm EverNu's relationship with the DOE if Dr. Lin did not accept it. Vouros, on the other hand, denied ever making such a threat.

183. Dr. Lin argues that Vouros testified falsely when he denied making this threat.  As she points out, while both Hutchison and Chesney testified that he made this threat, Vouros presented no corroborating witness for his denial even though Rohm and Haas had promised to produce one.  Indeed, Rohm and Haas promised to produce Shaw—the only other person who was part of the settlement conversation—just for this purpose.  (Rohm and Haas Opening Statement, Jan. 26, 2015.)  Rohm and Haas, however, never produced her even though she is alive and living in Philadelphia.  (James Vouros Test., Mar. 6.)

184. Yet even assuming that Vouros testified falsely about making this threat, it is not compelling enough evidence to prove that he more likely than not extended the offer because of Dr. Lin's EEOC charges.  Rather, it is more likely than not that Vouros, as he also testified, extended the offer because he wanted to end the litigation on mutually beneficial terms.

185. At this time, nearly four years after Rohm and Haas had first requested the 2003 discovery from Dr. Lin, she still refused to produce any of it.  That is, she had done nothing to quell Vouros's original, legitimate concerns that she was using Rohm and Haas's confidential information in EverNu's DOE-funded MAA work.  In fact, by refusing to produce the discovery for so long and despite many court orders, she had only exacerbated those concerns.[29]  Given this enduring standstill that showed no signs of abating, Vouros credibly testified that he extended the offer because he thought it gave the parties a way to "walk

---

[29] Vouros was also now even more concerned after receiving the Temple discovery and deposing Dr. Strongin.

away" on what he thought were mutually beneficial terms.  (James Vouros Test., Jan. 26.)
Dr. Lin would avoid paying the sanctions and continue to develop her MAA technology,
possibly using Rohm and Haas's confidential information, and Rohm and Haas would hold a
nonexclusive interest in that technology.

### 3.    December 2007 motion for default judgment

186.  Dr. Lin contends that Vouros approved of this motion for a default judgment against her
because she had filed and pursued her EEOC charges.  When Vouros approved of this
motion, however, she had still not produced any discovery despite all of Judge Moore's
orders.  Nor had she paid any sanctions that Judge Moore had ordered her and EverNu to
pay.  Vouros thus credibly testified that he approved of this motion because Dr. Lin had
willfully refused to provide any discovery or to pay any sanctions, and he just wanted to end
the case.  (James Vouros, Test. Mar. 6.)

187.  In May 2008, Judge Moore granted Rohm and Haas's motion, awarding it the permanent
injunction that precluded Dr. Lin from, among other things, using its confidential information
and working on MAA generally and on the DOE-funded MAA project specifically.[30]

### 4.    May 2008 sanctions judgments and July/August 2008 writs of execution on bank accounts

188.  Dr. Lin alleges that Vouros approved of these actions because she had filed and pursued her
EEOC charges.  Rohm and Haas obtained these judgments and served these writs of
execution soon after Judge Moore had granted its motion for a default judgment against Dr.
Lin.  At that time, Dr. Lin had still not paid any of the sanctions that Judge Moore had
awarded to Rohm and Haas.  Vouros thus more likely than not approved of these actions

---

[30] As discussed previously, the Superior Court affirmed Judge Moore's default judgment but reversed the portions of his permanent injunction that barred Dr. Lin from working with MAA.

because Rohm and Haas wanted to collect the sanctions owed by Dr. Lin and EverNu and to cause her to provide the discovery ordered.

### 5.     May 2008 – August 2008 DOE communications

189.  Dr. Lin alleges that Vouros communicated with the DOE between May 2008 and August 2008 because she had filed and pursued her EEOC charges.[31]  By contrast, Vouros testified that he communicated with the DOE during this time because he wanted to inform it of the May 2008 default judgment that Rohm and Haas had obtained that permanently enjoined Dr. Lin from working on MAA generally and on EverNu's DOE-funded MAA project specifically.  He also testified that he communicated with the DOE during this time because he still believed that Dr. Lin was using Rohm and Haas's confidential information in EverNu's MAA project and that the DOE was continuing to fund that work.  (James Vouros Test., Mar. 6.)  The evidence supports his testimony.

190.  On May 2, 2008, Judge Moore had enjoined Dr. Lin from, among other things, working on MAA generally and on EverNu's DOE-funded MAA project specifically.  Just eleven days later, on May 13, 2008, Vouros wrote his letter to David Hill at the DOE informing him of the injunction and requesting some follow-up actions, such as a description of what the DOE planned to do with the information generated by EverNu's DOE-funded MAA project.

191.  For many of his subsequent communications with the DOE between June and August 2008, Vouros urged it to stop funding EverNu.  For example, on July 18, he emailed the DOE asking if it had stopped all funding to EverNu.  He also, on August 11, emailed the DOE to

---

[31] As discussed previously, Vouros had also communicated with the DOE in December 2007.  That was when he first learned from the Philadelphia Inquirer article that Dr. Lin, over two years earlier, had sent Rohm and Haas's forty-five pages of confidential documents to the DOE, in violation of the parties' confidentiality stipulation and Judge Moore's order barring her from doing so.  Dr. Lin does not allege that this communication was retaliatory.

ask whether it owed EverNu any grant payments, and if so, how Rohm and Haas could serve the DOE to collect on the judgments that Dr. Lin and EverNu owed to the company.

192. While communicating with the DOE about its funding for EverNu, Vouros still reasonably believed that Dr. Lin was using Rohm and Haas's confidential information in EverNu's MAA project. Dr. Lin had never produced any discovery to Rohm and Haas in Montgomery County despite all of Judge Moore's orders. Vouros had seen only the abstract to the Phase I grant proposal, the Temple discovery, and Dr. Strongin's deposition—all of which understandably concerned him and suggested that Dr. Lin was hiding additional information.

193. Vouros also reasonably believed that the DOE was still funding this project. Throughout the Montgomery County litigation, Dr. Lin had never indicated to Rohm and Haas or Judge Moore that EverNu at some point might have concluded its DOE-funded MAA research. But as Vouros learned in September 2008 when the DOE formally responded to his May 2008 letter to Hill, EverNu's DOE-funded MAA project had ended back in June 2006. After learning this news, Vouros did not contact the DOE again about Dr. Lin and EverNu.

194. I therefore credit Vouros's testimony that he communicated with the DOE not because Dr. Lin had filed and pursued her EEOC charges but because he wanted to inform it of the permanent injunction, and because he reasonably believed she was still using its confidential information in EverNu's MAA project and that the DOE was continuing to fund this work.

195. The court credits Vouros's testimony and finds that Dr. Lin's EEO activity played no role in Vouros's communications to the DOE in May-August 2008.

196. Lin has submitted no evidence in support of her retaliation claims other than the undisputed facts concerning what occurred in the Montgomery County litigation, the DOE correspondence, and her attack on the credibility of the Rohm and Haas witnesses. As stated,

I find those witnesses credible and that their actions were based on legitimate, non-retaliatory, business reasons and were not a pretext for retaliation.

## II.    Conclusions of Law

1.  Dr. Lin claims that Rohm and Haas retaliated against her in violation of Title VII and the PHRA.  Under Title VII's anti-retaliation provision, an employer may not "discriminate against" an employee "because [she] has opposed" a practice forbidden under Title VII, "or because [she] has made a charge, testified, assisted, or participated" in a Title VII investigation, proceeding, or hearing.  42 U.S.C. § 2000e-3(a).  Under the PHRA, an employer may not "discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any [PHRA] investigation, proceeding or hearing."  43 Pa. Cons. Stat. Ann. 955(d).  "Claims under the PHRA are interpreted coextensively with Title VII claims."  *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006).

2.  The Third Circuit Model Civil Jury Instructions (Section 5.1.7) with reference to a Title VII retaliation claim provide that the plaintiff must prove the following by a preponderance of the evidence:

> First:  Plaintiff must engage in an activity protected by Title VII.

> Second:  Plaintiff was subjected to a materially adverse action at the time, or after, the protected conduct took place.  Plaintiff must show that the alleged retaliatory activity was serious enough that it well might have discouraged a reasonable worker from engaging in the protected activity.  The retaliatory activity need not be related to the workplace or the plaintiff's employment.

> Third:  There was a causal connection between the challenged activity and the plaintiff's protected activity.  Ultimately, the factfinder must decide whether plaintiff's protected activity had a determinative effect on the alleged retaliatory activity.  "Determinative

effect" means that if not for plaintiff's protected activity, the retaliatory activity would not have occurred.

In its Comment to the suggested instruction, the Third Circuit Model Civil Jury Instructions note that the defendant may give a non-retaliatory reason for its actions.  If the factfinder disbelieves defendant's explanations for its conduct then the factfinder may, but need not, find that plaintiff has proved retaliation.  In determining whether defendant's stated reason for its actions was a pretext, or excuse, for retaliation, the factfinder may not question the defendant's business judgment.  The factfinder cannot find retaliation simply because he or she disagrees with the business judgment of the defendant or believes it was harsh or unreasonable.  The factfinder is not to consider defendant's wisdom.  However, the factfinder may consider whether defendant's reason is merely a coverup for retaliation.

Ultimately, as set forth in *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013), "Title VII retaliation claims must be proved according to traditional principles of but- for causation, not the lessened causation test stated in § 2000e-2(m)."  This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.  *Id.* at 2534.

3.  "With respect to 'protected activity,' the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings (the 'participation clause') and those who oppose discrimination made unlawful by Title VII (the 'opposition clause')."  *Id.*  Here, Dr. Lin has proved that she engaged in protected activity by (1) filing her second EEOC charge in June 2000; (2) filing her third EEOC charge in August 2001; (3) pursuing those two charges in *Lin I* between June 2002 and July 2004; (4) filing her fourth EEOC charge in May

or June 2004; and (5) participating in the EEOC's investigation of that charge until August 2008.[32]

4.   As for the second element, the Court has established an expansive standard for determining what constitutes an adverse employment action.  In *Burlington Northern and Sante Fe Railway Co. v. White*, it concluded that Title VII's anti-retaliation provision "extends beyond workplace-related or employment-related retaliatory acts and harm."  548 U.S. 53, 67 (2006).  That is because "[a]n employer can effectively retaliate against an employee by taking actions not directly related to [her] employment or by causing [her] harm *outside* the workplace."  *Id.* at 63.  To establish an adverse employment action in a Title VII retaliation claim, then, a plaintiff must show only that the defendant's actions "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id.* at 68 (quotation marks omitted).

5.   Dr. Lin claims that the following events constitute adverse employment actions taken against her by Rohm and Haas: served her with the MAA-related discovery requests in April 2003; filed the motions to compel that discovery in June 2003; served EverNu with the subpoena for the MAA-related discovery in August 2003; moved for attorney fees in July 2004; sought sanctions in September 2004, February 2005, and March 2005; filed the motion for partial summary judgment in September 2005; reduced sanctions orders to judgments in June 2006; served Dr. Lin with writs of execution against EverNu's bank account to collect those judgments in July 2006; extended the settlement offer in March 2007; moved for default judgment in December 2007; and contacted the DOE about Dr. Lin and EverNu between

---

[32] Dr. Lin claims that she also engaged in protected activity by participating in the EEOC's investigation of her fourth charge after August 2008, and by then pursuing the case here based on that charge after the EEOC had issued its right-to-sue letter in March 2011.  Yet even assuming that these activities are protected, they are not relevant to this case.  Dr. Lin has alleged adverse actions between April 2003 and August 2008, so she cannot claim that Rohm and Haas acted adversely during that time because of protected activity she engaged in after August 2008.

May and August 2008.  In their totality these actions "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." As they are factually uncontested they constitute adverse employment actions under Title VII's anti-retaliation provision.  *See id.*

6.  Nevertheless, Dr. Lin is precluded from averring that Rohm and Haas took some of these adverse actions against her because she had filed and pursued her EEOC charges.  Earlier in this case, I held that "res judicata precludes Dr. Lin from asserting claims based on the 2003 discovery requests in this action," because those requests had been raised and addressed in *Lin I. Lin v. Rohm & Haas Co.*, 865 F. Supp. 2d 649, 661 (E.D. Pa. 2012).  For that reason, I concluded that, in this case, she could assert as adverse employment actions only those that occurred after July 27, 2004, which is when *Lin I* ended.  *Id.*  Dr. Lin thus cannot maintain that Rohm and Haas took the following adverse employment actions against her because of her EEOC charges: served her with the MAA-related discovery requests in April 2003; filed the motions to compel that discovery in June 2003; and served EverNu with the subpoena for the MAA-related discovery in August 2003.[33]

7.  The dispositive issue is whether Dr. Lin established at trial by a preponderance of the evidence that "her protected activity was a but-for cause of the . . . adverse action[s] by [Rohm and Haas.]"  *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013).  "[A]n [activity] is not regarded as a [but-for] cause of an [action] if the particular [action] would have occurred without it."  *Id.* (citation omitted) (quotation mark omitted). Lin argues that Rohm and Haas's proffered reasons for its conduct were pretextual because the implausibilities, inconsistencies and incoherences in Rohm and Haas's reasons render

---

[33] Even if she could maintain these events as adverse employment actions, she has still failed to show that Rohm and Haas took them because of her EEOC charges, for reasons reflected in Part R.1 of my findings of fact.

them unworthy of credence and create the inference that Rohm and Haas did not act for the asserted nondiscriminatory reasons.  I reject this argument as I found that there were no such implausibilities, inconsistencies and incoherences.  Rohm and Haas had legitimate non-retaliatory business reasons for its conduct of the Montgomery County litigation and its contacts with the DOE which were explained fully at trial, supported by credible testimony and documentary evidence from its witnesses, and not contradicted by any evidence submitted by the plaintiff.[34]

8.    As articulated in my above findings of fact, Dr. Lin did not establish at trial by a preponderance of the evidence that Rohm and Haas acted as it did because of her EEOC charges. Lin has not proven her protected activity was the but-for cause of the Rohm and Haas litigation conduct (in almost all of which Rohm and Haas was successful) that forms the basis of the claims in this action. Lin has not proved that her protected activity was the but-for cause of the Rohm and Haas interactions with the DOE that are the basis of her claims in this action. Rather, Rohm and Haas via Vouros acted as it did because of the legitimate, non-retaliatory reasons that it proffered.  In other words, the evidence shows that Rohm and Haas, via Vouros and others, would have taken each of the claimed adverse employment actions against Dr. Lin regardless of whether she had filed and pursued her EEOC charges against the company and those actions were not a pretext for retaliation. As a result, I must conclude, on this record, that Rohm and Haas has not violated the anti-retaliation provisions of Title VII and the PHRA.

---

1.    [34] Plaintiff urges that I use the *McDonnell Douglas* framework of first establishing a prima facie case, then considering pretext and causation.  I believe that this framework "drops out of the case" at the trial stage (as opposed to the summary judgment stage); however, whichever framework applies, the ultimate resolution of this case comes down to a determination of causation and plaintiff has been unable to establish that defendant's reasons for its actions were a pretext for retaliation or that there was "but-for" causation.